STATE OF NORTH CAROLINA v. ROBERT HENRY McDOWELL

No. 80

(Filed 4 November 1980)

1. **Constitutional Law § 48– case transferred to another county – indigent defendant – no right to counsel from new county**

    An indigent defendant whose case was transferred from Lee County to Johnston County because of extensive news coverage of an attempted jailbreak in Sanford was not entitled to the appointment of additional counsel from Johnston County, since defendant was already adequately represented by two court-appointed attorneys.

2. **Constitutional Law § 43– photographing of defendant – no right to counsel**

    There was no merit to defendant's contention that a photographic identification ought to be suppressed because the procedure violated his Sixth Amendment right to counsel since, at the time defendant was photographed, he had not formally been charged with any offense, and his right to counsel therefore had not attached.

3. **Constitutional Law § 76– photographing of defendant – no violation of right against self-incrimination**

    Defendant's Fifth Amendment privilege against self-incrimination was not violated when he was photographed in a parole office, since the privilege protects an accused only from being compelled to testify against himself or otherwise to provide the State with evidence of a testimonial or communicative nature.

4. **Criminal Law § 43.1; Searches and Seizures § 1– photographing of defendant – no unreasonable search and seizure**

    Defendant's Fourth Amendment right to be free from unreasonable searches and seizures was not violated by the taking of his photograph, since the Fourth Amendment offers no shield for that which an individual knowingly exposes to public view, and one does not have a reasonable expectation of privacy in those features which are exposed to the view of others as a matter of course.

5. **Criminal Law § 66.18– identification of defendant – voir dire not required**

    The trial court did not err in failing to order a voir dire before permitting an assault victim to make an in-court identification of defendant, since defendant made a pretrial motion to suppress any identification of him by the victim; a voir dire was held and the trial judge made findings of fact and conclusions of law in an order which denied defendant's motion; though the victim did not testify at the voir dire, the evidence adduced in no way suggested that defendant's photograph was singled out from those viewed by the victim in her hospital room; and defendant was not prevented from calling the victim as a witness at the voir dire and so was not denied his right of confrontation.

**6. Criminal Law § 93– opening statement – statutory right waived by defendant**

By his failure to request the opportunity to make an opening statement, defendant engaged in conduct inconsistent with a purpose to insist upon the exercise of a statutory right, and defendant's conduct at trial amounted to a waiver of this procedural right. G.S. 15A-1221(a)(4).

**7. Criminal Law § 35– homicide case – killing of another person – insurance proceeds on victim's life – evidence properly excluded**

In a prosecution of defendant for first degree murder and assault with a deadly weapon with intent to kill inflicting serious injury, the trial court did not err in excluding evidence of the killing the day after the crime of the victim's mother's friend, nor did the court err in refusing to permit defendant to cross-examine the victim's step-grandfather with respect to whether he was the beneficiary of any insurance on the victim's life.

**8. Criminal Law § 113.1– evidence favorable to defendant on cross-examination – when evidence must be summarized**

While a trial judge must summarize evidence favorable to defendant which is brought out on cross-examination, there is no requirement that this be done when the evidence does not go to the establishment of a substantive defense but is instead of an impeaching quality and effect.

**9. Criminal Law § 116– defendant's failure to testify – instruction not erroneous**

While it is the better practice for a trial judge not to instruct on a defendant's election not to testify or otherwise offer evidence absent a request, the trial court's instruction that, while defendant had elected not to present any evidence, they were not to allow that decision to influence their deliberations did not constitute reversible error.

Justice BROCK took no part in the consideration or decision of this case.

APPEAL by defendant from judgments of *Smith, J.*, entered at the 3 December 1979 Criminal Session of JOHNSTON Superior Court.

Having entered pleas of not guilty, defendant was tried upon bills of indictment proper in form which charged him with the crimes of (1) first-degree murder and (2) assault with a deadly weapon with intent to kill inflicting serious injury. The trial was conducted in the bifurcated manner mandated by G.S. § 15A-2000 *et seq.* Phase one of the trial determined the guilt or innocence of defendant. Phase two of the trial was held to determine his sentence for first-degree murder following his conviction of that charge.

During the guilt determination phase of trial, the state introduced evidence which tended to show:

On 14 July 1979, Carol Ann Hinson, age four, and Patsy Ann Mason, age fourteen, were living in the home of Patsy's parents, John and Sarah Mason, in Sanford, North Carolina. The Masons were Carol's step-grandparents. Sometime after 11:00 p.m., on said date, the girls went to bed.

The two girls shared the same bedroom. At some point between the time they went to bed and 1:00 a.m., they were awakened by a knock on the door at the end of an entryway which led from their bedroom to the outside. Both girls got out of bed and went to the door.

Without asking the identity of the early-morning caller, Patsy opened the door slightly and saw a man. The visitor was a black man with large eyes and a big nose; he was wearing a dark pullover shirt and blue jeans and his hair was plaited. Patsy identified defendant as being the man she had seen standing outside of the door that morning. At the time he was first seen by the two girls, defendant was carrying a machete which Patsy described as being approximately two feet long. As Patsy tried to close the door, defendant entered the house.

Upon entering the house, defendant greeted both girls by their names, even though Patsy had never seen him before that night. Defendant went into the girls' bedroom and sat upon the bed. As the girls sat down on the bed, defendant began talking with them, specifically asking Patsy if she would like to go bicycle riding with him. Patsy insisted that she could not go bicycling with him.

After declining defendant's invitation to go bicycling, Patsy observed that defendant still held a machete in his hand. Upon telling Patsy that he had purchased the knife at a discount store in Sanford, defendant asked her if her parents were asleep. After Patsy replied affirmatively, defendant warned her to be quiet and not make any noise otherwise he would cut her with the knife.

Throughout this time, defendant had been tickling Carol. After warning Patsy to remain still, defendant made two attempts to get Carol to leave the room by suggesting that she go to the bathroom. In both instances, the child refused to follow the suggestion. After each attempt to get the four-year-old out of the room, defendant turned to Patsy and told her that

he was going to rape her. On both occasions, Patsy rebuffed his statement. In the first instance, defendant did nothing except resume tickling the younger child, Carol. After the second instance, however, as Carol was making her way out of the bedroom, defendant grabbed her and threw her on the bed whereupon Patsy picked her up and held her in her lap.

As Patsy held Carol in her arms, defendant began to strike at the children with the machete. Despite the protests and other resistance of the two girls, defendant continued his attack upon them. After Patsy was struck on her head by defendant's knife, she lost consciousness which she did not regain until she awoke as a patient at Duke Medical Center in Durham. While she was at the Medical Center, she was treated for injuries which included lacerations about her head, as well as to a wrist and several fingers. After inflicting numerous wounds to the two children, defendant left the house.

At approximately 1:00 a.m., Mr. Mason awoke. He had fallen asleep at about 11:00 p.m. while he was watching television. It was his custom to look in on the children before he went to bed each night. As he walked through the kitchen towards the girls' bedroom, Mr. Mason observed that the outside door at the end of the entryway was open. After shutting the door, he turned around and saw Patsy sitting in a nearby bathroom. Patsy's face was covered with blood and the bathroom had been bloodied from her wounds. After wiping Patsy's face with a washcloth so that she could see, Mr. Mason went to the bedroom which he shared with his wife and awakened her. Upon telling his wife to summon the rescue squad because "something had happened to the children", Mr. Mason went into the girls' bedroom and found Carol lying at the foot of a bed. Carol was pronounced dead on arrival at Lee County Hospital in Sanford. A subsequent autopsy revealed that she had been wounded nine times. Six of the wounds were to her head; her left arm had been cut at least three times; and on her right hand, her thumb, as well as her index finger, had been amputated at the middle joint.

Defendant did not offer any evidence.

Defendant was found guilty as charged and the court convened a sentencing hearing before the same jury in order to determine the sentence to be imposed on the murder conviction.

During this phase of the trial, the state introduced evidence which tended to show that defendant had pled guilty to a charge of second-degree murder in Cumberland County in 1970. On 31 October 1977, he was paroled and until the time of his arrest on 21 July 1979, he was under the supervision of the Department of Correction.

During the sentencing hearing, defendant presented evidence which tended to show that after his release from prison, he had been employed in the Sanford area as a welder. Those with whom defendant worked testified that he had a good work record and got along well with others.

Issues with respect to punishment were submitted to and answered by the jury as follows:

Issue One:

Do you unanimously find from the evidence, beyond a reasonable doubt, that one or more of the following aggravating circumstances existed at the time of the commission of this murder?

ANSWER: Yes.

(1) Had Robert Henry McDowell been previously convicted of a felony involving the use of violence to the person?

ANSWER: Yes.

(2) Was this murder especially heinous, atrocious or cruel?

ANSWER: Yes.

(3) Was this murder for which defendant stands convicted part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person?

ANSWER: Yes.

Issue Two:

Do you unanimously find from the evidence beyond a reasonable doubt that the aggravating circumstance or

circumstances found by you are sufficiently substantial to call for the imposition of the death penalty?

ANSWER: Yes.

Issue Three:

> Do you find one or more mitigating circumstances?

ANSWER: Yes.

(1) Robert Henry McDowell has no significant history of prior criminal activity.

ANSWER: No.

(2) Are there any *other* circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value?

ANSWER: Yes.

Issue Four:

> Do you unanimously find that the mitigating circumstances are insufficient to outweigh the aggravating circumstances?

ANSWER: Yes.

The jury recommended that a sentence of death be imposed upon the defendant. Pursuant thereto the court imposed the death sentence. On the felonious assault charge, defendant was sentenced to twenty years imprisonment.[1]

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General Lester V. Chalmers, Jr., for the state.*

*F. Jefferson Ward, Jr., for defendant-appellant.*[2]

BRITT, Justice.

---

[1]Defendant's motion to bypass the North Carolina Court of Appeals on the assault conviction was allowed by this court 5 March 1980.

[2]In addition to Mr. Ward, defendant was also represented at trial and on appeal by the Honorable J.W. Hoyle of Sanford. However, Mr. Hoyle died between the time defendant's brief was filed and the time the appeal was argued.

We find no prejudicial error in either phase of defendant's trial and conclude that the verdicts and judgments should not be disturbed.

## PHASE I — GUILT DETERMINATION

[1] By his first assignment of error, defendant contends that the trial court erred in denying his motion for the appointment of additional counsel from Johnston County. There is no merit in this assignment.

It is manifest that the state has the responsibility to provide an indigent defendant with the effective assistance of counsel and the other necessary resources which are incident to presenting a defense in a criminal prosecution. G.S. § 7A-450 (1969); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979). However, the right of a criminal defendant to court appointed counsel does not include the right to require the court to appoint more than one attorney unless there is a clear showing that the interests of the defendant are not being adequately represented by the counsel already appointed. *State v. Barfield*, *supra*. While this precept embodies a consistent standard of proof to guide its implementation, it is apparent that its application will produce conclusions which will vary depending upon the nature of individual cases. It is with this consideration in mind that we turn to a brief examination of the facts of the present case as they relate to this assignment of error.

Although defendant was indicted by the Lee County Grand Jury, he was convicted at a trial which was held in Johnston County. Defendant was initially brought to trial in Lee County in November 1979. However, after the jury had been impaneled, there was an attempted jailbreak in Sanford which received extensive attention from the news media. Upon motion of defense counsel, the presiding judge declared a mistrial and ordered a change of venue to Johnston County where the case was brought on for trial on 3 December 1979.

The essence of defendant's argument is that his right to due process of law could be effectively safeguarded only by the appointment of an attorney from Johnston County. Defendant contends that such an attorney would be in a superior position to assist defense counsel, who were members of the Lee County bar, in the selection of a jury. In support of his argument,

defendant suggests that the district attorney was in an unfair strategic position to try this case in that he was a native of Johnston County, and, as such, he was better equipped to select a jury which would be sympathetic to the state's case. We are not impressed with this argument.

Upon a finding of indigency, defendant had been provided with the services of court-appointed counsel. In fact, by the time defendant's case was called for trial, the initial appointment of counsel had evolved to the point where defendant was represented by two court-appointed attorneys. Together with Harnett County, Lee and Johnston Counties constitute the Eleventh Judicial District. It is commonplace in North Carolina for attorneys who live in one county to try cases in other counties in their judicial district, as well as in other districts of the state. Several of our judicial districts are composed of rural counties whose populations are of a low to medium density. Though the geographical dimensions of these districts may be rather substantial, the demographics of the population within a particular district will be generally consistent throughout the unit. With the development of modern communications, as well as the construction of an extensive transportation system, many attorneys no longer confine their practices to the areas immediately surrounding their homes.

It is apparent from the record before us that the crimes which resulted in judgments against defendant are of such a nature as to provoke interest among residents in the area in the subsequent proceedings against defendant. The possibility of an irreparably prejudiced venire was vitiated by the change of venue which removed the prosecution to Johnston County. While the change of venue did nothing to lessen the severity of the crimes or the seriousness of the accusations against defendant, the change of venue did serve to place the prosecution in an area less likely to be tainted with preconceived notions about defendant's guilt or innocence, particularly in light of the attempted jailbreak in Sanford. Nor would a venire which was drawn from the population of Johnston County be as likely to have individuals who were interested in the disposition of this case because of affinity or consanguinity.[3] It would seem, there-

---

[3]According to the 1970 census, Johnston County has a land area of 797 square miles and a population of 61,737 which is 77 percent rural. North Carolina Manual 136 (1979).

fore, that Johnston County was a more favorable venue from the standpoint of the defendant's right to a fair trial notwithstanding the fact that the district attorney was a resident of that county.

In summary, while it remains the law of this state that there may be situations in which the right to the effective assistance of counsel can be safeguarded only by the appointment of additional counsel, *State v. Barfield, supra,* such a situation is not present in this case. There has been no showing that the burdens which were shouldered by defense counsel in the representation of their client were so disproportionate to that borne in the usual course of criminal defense work required the court to appoint another attorney to provide assistance.

By his second assignment of error, defendant contends that the trial court erred in denying his motion to suppress a photographic identification of him which was made by Patsy Ann Mason. In support of this contention, defendant offers three distinct grounds for his objection, suggesting that the procedure in question violated his rights under the fourth, fifth, and sixth amendments to the United States Constitution. We find no merit in this assignment.

In 1970, defendant pleaded guilty to a charge of second-degree murder in Cumberland County. In 1977, he was placed on parole, subject to continued supervision by the Department of Correction. A condition of his parole required defendant to report promptly to his parole officer when instructed to do so, as well as in the manner prescribed by his parole officer.

On 20 July 1979, Charles Mann was a parole officer with the Department of Correction and was supervisor of parole officers in Lee and Harnett Counties. In that capacity, he served as immediate supervisor of defendant's parole officer. It is the policy of the Department of Correction to maintain up-to-date photographs of parolees in its files. On 20 July 1979, the only photograph of defendant in the files of the department had been taken on 26 May 1976.

Before 20 July 1979, the files of the Sanford probation office had been routinely available to law enforcement officers in general, and agents of the State Bureau of Investigation in

particular. On 20 July 1979, agents of the S.B.I. informed Mr. Mann that defendant was a suspect in the investigation of the murder of Carol Ann Hinson and the assault of Patsy Ann Mason. Accordingly, they requested that Mr. Mann allow them to review defendant's parole file. The request was granted. Upon making the ensuing review of the file, agents of the S.B.I., as well as officers of the Sanford Police Department, requested that Mr. Mann secure a more recent photograph of defendant for their use.

On the afternoon of 20 July 1979 between the hours of 3:00 and 3:30, Mr. Mann went to defendant's place of employment, Brackett Steel Company. Mr. Mann asked defendant to report to the parole office to have his picture taken. The officer told defendant that the files were being updated and that the picture which the files already contained was not current. Later that same day, defendant reported to the office as he has been instructed to do.

After the photograph was made and a print was developed, law enforcement officers prepared two manilla folders containing various photographs. The photographs portrayed black men whose hair was braided or plaited. The second folder contained a series of photographs of black men whose complexions varied and whose clothing differed. The photograph of defendant that had been obtained at the probation office was placed in the second folder.

Both folders were taken to Duke Medical Center where they were displayed before Patsy Ann Mason. There is no evidence in the record which would tend to suggest that the photograph of defendant was in any way singled out by the officers for the special attention of Patsy. The girl picked out defendant's photograph within moments of opening the second folder.

Defendant made a pretrial motion to suppress the photographic identification. After conducting a voir dire, the court overruled defendant's motion. There was no error.

[2] Defendant initially contends that the photographic identification ought to be suppressed because the procedure violated his sixth amendment right to counsel. We disagree. The sixth amendment right to consel attaches only upon the initiation of adversary judicial criminal proceedings, whether by way of

formal charge, preliminary hearing, indictment, information, or arraignment. *Kirby v. Illinois*, 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972); *State v. Matthews*, 295 N.C. 265, 245 S.E. 2d 727 (1978), *cert. denied*, 439 U.S. 1128 (1979); *State v. Finch*, 293 N.C. 132, 235 S.E. 2d 819 (1977). At the time defendant was photographed, he had not been formally charged with any offense. While it is true that the investigation had narrowed its focus upon him, it had not so progressed that the state had committed itself to prosecute. It is only when the defendant finds himself confronted with the prosecutorial resources of the state arrayed against him and immersed in the complexities of a formal criminal prosecution that the sixth amendment right to counsel is triggered as a guarantee.

[3] Nor was defendant's fifth amendment privilege against self-incrimination violated when he was photographed in the parole office. It is well established that routine police procedures such as the taking of handwriting samples, blood samples, fingerprints, and hair samples from a defendant, as well as the taking of his photograph are outside the scope of the fifth amendment guaranty because the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the state with evidence of a testimonial or communicative nature. *Schmerber v. California*, 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966); *State v. Wilson*, 296 N.C. 298, 250 S.E. 2d 621 (1979); *State v. Wright*, 274 N.C. 84, 161 S.E. 2d 581 (1968), *cert. denied*, 396 U.S. 934 (1969).

[4] Similarly, we are not persuaded that defendant's fourth amendment rights were violated by the taking of his photograph. The fourth amendment offers no shield for that which an individual knowingly exposes to public view. *Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *State v. Leggette*, 292 N.C. 44, 231 S.E. 2d 896 (1977). It follows, therefore, that an individual's personal traits, such as his facial appearance or the tone and manner of his voice, are not within the purview of the fourth amendment's protection against unreasonable searches and seizures. One does not have a reasonable expectation of privacy in those features which serve to distinguish one individual from another and which are exposed to the view of others as a matter of course. *United States v. Dionisio*, 410 U.S. 1, 35 L. Ed. 2d 67, 93 S. Ct. 764 (1973); *Davis v.*

*Mississippi*, 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct. 1394 (1969); *State v. Sharpe*, 284 N.C. 157, 200 S.E. 2d 44 (1973).

[5] In a related assignment of error, defendant contends that the trial court erred by failing to suppress his in-court identification by Patsy Ann Mason. This assignment is without merit.

During her direct examination, Patsy was asked if she saw the man who had come into her bedroom on the evening of 14 July 1979 seated in the courtroom. Over objection, she was permitted to identify defendant. Defendant now argues that the trial court should have ordered a voir dire at that point so that he could have inquired as to her opportunity to view her assailant, as well as the manner in which she identified defendant's photograph among those which she viewed in her hospital room at Duke Medical Center.

The record reveals that defendant made a pretrial motion to suppress any identification of him by Patsy. After a voir dire was held, the trial judge made findings of fact and conclusions of law in an order which denied defendant's motion. While it is true that Patsy did not testify at the hearing, no right of defendant was denied by the proceeding. The gist of defendant's complaint is that he was denied the opportunity to question the prosecuting witness as to the circumstances surrounding her photographic identification of him, as well as her opportunity for observation of her assailant. In no way can it be said that defendant was denied his right of confrontation. There is no requirement that the state call any particular witness at a voir dire which is held on a motion to suppress. The evidence which was adduced at the voir dire does not in any way suggest that defendant's photograph was singled out for the special attention of Patsy. Furthermore, the record does not suggest that defendant was prevented from calling Patsy as a witness at voir dire. Defendant's lack of an opportunity to question the prosecuting witness in this regard stemmed not from the action of the court but from a tactical decision made on his behalf prior to trial.

[6] By his third assignment of error, defendant contends that the trial court erred in denying him the opportunity to make an opening statement. There is no merit in this assignment.

G.S. § 15A-1221(a)(4) provides that the defendant in a criminal case, as well as the state, must be given the opportunity

to make a brief opening statement. The record before us in the present case is completely silent with respect to any mention by either the trial court or defense counsel concerning an opening statement. It is well established that a defendant may waive the benefit of statutory or constitutional provisions by express consent, failure to assert it in apt time, or by conduct inconsistent with a purpose to insist upon it. *State v. Gaiten,* 277 N.C. 236, 176 S.E. 2d 778 (1970). It follows that in order for an appellant to assert a constitutional or statutory right on appeal, the right must have been asserted and the issue raised before the trial court. *State v. Parks,* 290 N.C. 748, 228 S.E. 2d 248 (1976). In addition, it must affirmatively appear on the record that the issue was passed upon by the trial court. *City of Durham v. Manson,* 285 N.C. 741, 208 S.E. 2d 662 (1974); *State v. Braswell,* 283 N.C. 332, 196 S.E. 2d 185 (1973). By his failure to request the opportunity to make an opening statement, defendant engaged in conduct inconsistent with a purpose to insist upon the exercise of a statutory right. Therefore, his conduct at trial amounts to a waiver of this procedural right.

[7] Defendant's fourth assignment of error relates to the testimony of John Earl Mason. Mr. Mason testified that after Carol's body had been removed from his house and Patsy had been taken to a hospital for treatment, he and his wife were taken to the Sanford Police Department so that they could make several phone calls. While they were at the police station, the Masons talked by telephone with Cliff Ferguson, a friend of Terry Hinson, the mother of Carol. The Mason couple had adopted Carol and her brother, Jerome. Ms. Hinson was the daughter of Mrs. Mason. Ms. Hinson had instructed the couple to call Mr. Ferguson's home in the event that she was needed. On cross-examination of Mr. Mason, defendant sought to establish that Mr. Ferguson was killed the next day. The objection of the district attorney was sustained, and Mr. Mason was not permitted to answer the question.

There was no error. Defendant argues that the evidence was relevant to establish the violent atmosphere which surrounded the Mason household in that it tended to establish a connection between two deaths, that of Carol Ann Hinson and that of Cliff Ferguson. The only connection between the two deaths that has been demonstrated to this court is the relationship of the decedents to Terry Hinson. Ms. Hinson not only

was Carol's mother, she was also a friend of Mr. Ferguson. No other connection is apparent or has been demonstrated. While it remains the general rule that evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue, *e.g.*, *State v. Banks*, 295 N.C. 399, 245 S.E. 2d 743 (1978), no such tendency exists in regard to a purported connection between the two deaths. Indeed, such evidence, nothing else appearing, would have done nothing in the present case except confuse the issues before the jury.

Similarly, it was not error for the trial court to refuse to permit defendant to cross-examine Mr. Mason with respect to whether he was the beneficiary of any insurance on Carol's life. In the absence of the jury, Mr. Mason testified that an insurance company had paid him the sum of $5,000 upon the child's death. We are unable to agree with defendant's contention that the evidence was relevant on the question of a motive Mr. Mason would have had in regard to the death of Carol. Such an argument is purely speculative in that it finds no support whatsoever in the record. Evidence that a crime was committed by another must point unerringly to the guilt of another. *State v. Jenkins*, 292 N.C. 179, 232 S.E. 2d 648 (1977); *State v. Smith*, 211 N.C. 93, 189 S.E. 175 (1937). Evidence which does no more than cast suspicion upon another or to raise a mere conjectural inference that the crime may have been committed by another is inadmissible. *State v. Shinn*, 238 N.C. 535, 78 S.E. 2d 388 (1953).

[8] Defendant also contends that the trial court erred in its charge to the jury in two respects. He first submits that evidence favorable to him which had been elicited on cross-examination was not summarized for the jury as was the case with evidence favorable to the state. This contention is controlled by *State v. Moore*, 301 N.C. 262, 271 S.E. 2d 242 (1980), in which we held that while a trial judge must summarize evidence favorable to defendant which is brought out on cross-examination, there is no requirement that this be done when the evidence goes not to the establishment of a substantive defense but rather is of an impeaching quality and effect.

In the present case, the trial judge failed to instruct the jury, among other things, that no bloodstains had been found

on defendant's bicycle, his underclothing, or on the nunchukas which had been seized by police. Nor did the trial judge undertake to direct the jury's attention to the fact that Patsy had worn glasses since the first grade or that she was unable to say that the state's exhibit 8, a set of nunchukas, was the weapon which she had seen in the back pocket of her assailant. All of this evidence, while competent, goes to affect the weight to be accorded these matters rather than the establishing of a substantive defense, as was the case in *State v. Sanders*, 298 N.C. 512, 259 S.E. 2d 258 (1979).

**[9]** Similarly, it was not error for the trial judge to instruct the jury that while defendant had elected not to present any evidence, they were not to allow that decision to influence their deliberations. We have repeatedly held that while it is the better practice for a trial judge not to instruct on a defendant's election not to testify or otherwise offer evidence absent a request, such an instruction does not constitute reversible error. *E.g., State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976).

## PHASE II — SENTENCE DETERMINATION

Although defendant has not brought forward and argued to this court any assignment of error which relates to the submission of a particular aggravating circumstance to the jury, in view of the penalty that has been imposed, we have carefully considered those which were submitted. We conclude that the trial court did not err in this respect. *See State v. Barfield, supra; State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979).

As a check against the capricious or random imposition of the death penalty, G.S. § 15A-2000(d)(2) authorizes this court to review the record in a capital case to determine whether the record supports the jury's finding of any aggravating circumstance, whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We have carefully reviewed the record of defendant's trial. We have given serious consideration to the briefs and arguments which have been presented to us. It is our conclusion

that there is sufficient evidence in the record to support the jury's findings as to the aggravating circumstances which were submitted to it. Nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Considering the brutal manner in which Carol Ann Hinson was murdered and Patsy Ann Mason was seriously injured, and considering defendant's prior history of violent criminal behavior, we conclude that the sentence of death in this case is not excessive and that we should not exercise the discretion given us by statute to set aside the sentence imposed.

No error.

Justice BROCK took no part in the consideration or determination of this case.