STATE OF NORTH CAROLINA v. DAVID LAWSON

No. 142A81

(Filed 30 April 1984)

1. **Criminal Law § 73.2— admission of defendant—exception to hearsay rule**

   A witness's testimony concerning defendant's statements to her about the offenses for which he was being tried were admissible under the party admission exception to the hearsay rule.

2. **Criminal Law § 89.2— prior statements of witness—offered as corroborating testimony**

   It was proper for officers to testify regarding a witness's prior statements which were consistent with her in-court testimony and which corroborated that testimony.

3. **Criminal Law § 99.4— trial court's comments and explanations of voir dire— evidence jury left courtroom—comments not emphasizing importance of witness's testimony**

   A trial judge's comments explaining a voir dire did not prejudicially emphasize a witness's testimony where (1) the record indicated that the jury had left the courtroom, (2) assuming *arguendo* the jury heard the complained of comments, there was nothing in the comments to suggest that the court was suggesting that the witness's testimony was extremely important since the witness was the only eyewitness to the shooting and the importance of his testimony was obvious to the jury, and it was not improper for the judge to tell the jury that he was going to rule on the competency of the proffered testimony, and (3) even if the comments could be deemed error, a different result would not have been reached at trial had the error not been committed since the evidence against defendant was overwhelming. G.S. 15A-1443(a).

4. **Constitutional Law § 80; Homicide § 31.3— constitutionality of death penalty statute—discretion of district attorney**

   Where the United States Supreme Court has said the federal constitution does not prohibit the use of absolute prosecutorial discretion in determining which cases to prosecute for first degree murder so long as such discretionary decisions are not based on race, religion, or some other impermissible classification, the North Carolina Supreme Court is not inclined to interpret our state constitution to require more. Therefore, defendant's argument that our death penalty statute violates the equal protection of the laws clause of the Fourteenth Amendment because it afforded the district attorney "unbridled" discretion in deciding against whom he will seek verdicts of first degree murder and the death penalty must fail where defendant failed to show that the district attorney based his decision to seek the death penalty in defendant's case upon unjustifiable standards like "race, religion or other arbitrary classification."

5. Homicide § 31.3— constitutionality of sentencing statute for death penalty cases providing for review of judgment and sentence by Supreme Court

G.S. 15A-2000(d) does not require the Supreme Court to find facts, a function for which it has no jurisdiction; rather, the statute requires the Supreme Court to determine, as a matter of law, whether (1) the record supports the jury's finding of any aggravating circumstance upon which the trial court based its sentence of death, (2) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, or (3) the sentence of death was excessive or disproportionate to the penalty imposed in similar cases. Nor are the terms "under the influence of passion, prejudice or any other arbitrary factor" unconstitutionally vague.

6. Criminal Law § 135.10— proportionality review of death sentence

In a prosecution for first degree murder, there was nothing in the record which suggested that the sentence of death was influenced by "passion, prejudice, or any other arbitrary factor." Further, the sentence of death was not excessive or disproportionate to the penalty imposed in similar cases where the evidence tended to show that the murder and the attempted murder were accomplished as the result of defendant's careful, cold and calculated determination that he would prefer murdering these persons to risking their being able to testify against him and possibly send him back to prison; where defendant at the sentencing hearing told the jury that if it believed he committed the murder, "Gas me" and "I'd like the death penalty"; where defendant offered little in mitigation of the murder; and where the jury, on supporting evidence, concluded that the murder was aggravated because it was committed to avoid arrest and was part of a course of conduct which involved a crime of violence against another person. There was no suggestion in this case that defendant's mental capacity was impaired or that he was under the influence of a mental or emotional disturbance. All the evidence showed that the murder and the attempted murder were coldly and calculatedly perpetrated because defendant did not want to leave any witnesses who might send him back to prison, and "the motive of witness elimination lacked even the excuse of emotion."

Justices MARTIN and FRYE did not participate in the consideration or decision of this case.

APPEAL by defendant from a judgment of *Judge James C. Davis*, entered at the 1 June 1981 Criminal Session of CABARRUS Superior Court, imposing a death sentence upon the jury's recommendation following defendant's conviction of first degree murder. N.C. Gen. Stat. § 7A-30 (1981). We allowed defendant's motion to bypass the Court of Appeals in two companion cases in which lesser sentences were imposed. These were judgments imposing, respectively, a twenty-year sentence of imprisonment upon defendant's conviction of assault with a deadly weapon with intent to kill inflicting serious injury, and a ten-year sentence of imprisonment for felonious breaking of a dwelling house.

*Rufus L. Edmisten, Attorney General, by Elizabeth C. Bunting, Assistant Attorney General, for the state.*

*James C. Johnson, Jr., for defendant appellant.*

EXUM, Justice.

In this appeal defendant contends the trial court erred by failing to exclude certain evidence and by improperly expressing its opinion to the jury. He also asks us to declare North Carolina's death penalty statute unconstitutional. We find no merit in any assignment and leave undisturbed the judgments entered by the trial court.

I.

In December 1980, Buren Shinn resided in a house on Old Salisbury Road approximately three miles from Concord. Buren's son Wayne lived in a house located about 100 yards away. Buren and Wayne worked together in a family electrical business.

After driving to his father's home on 4 December 1980, Wayne heard the burglar alarm at his own home. Wayne and Buren jumped into a truck and rushed over to Wayne's house, where they observed a dirty brown Ford parked in the driveway. Wayne got out of the truck and ran towards the patio at the side of his house. Buren then saw Wayne throw up his hands and heard a gun fire.

Buren ran to the truck, got in and began backing the truck in an effort to get away. Defendant ran toward him, waving a pistol. This sight diverted Buren's attention and he backed the truck into a ditch. Defendant approached the truck and ordered Buren to get out and move towards Wayne's house. Buren did so, pleading with defendant not to hurt him.

Before Buren reached the house, he heard another gunshot and felt a sharp blow to his head. He fell to the ground and lost consciousness. Sometime later he "came to," finding himself lying in a large pool of blood. Fearing that defendant might still be in the vicinity, he lay silently. Some twenty or thirty minutes later, he heard someone walk toward him and he felt a hand reach into his pocket and take his wallet.

Buren remained motionless for another twenty minutes. Hearing no more footsteps, he partly raised himself up. Seeing no one, he crawled away from the patio toward the road, hoping to stop a passing car. When no one stopped, he struggled to his feet and walked toward his home. As he entered his home, another son, Jerry, saw him and telephoned for help. After Jerry was told what had happened, he left to see about Wayne.

Law enforcement officers arrived at Wayne's house and found him lying in a pool of blood in the basement near the patio. Wayne and Buren were taken to a hospital where Wayne was pronounced dead as the result of a bullet wound to his head. Buren's injuries were not severe, as the bullet which struck him did not penetrate his skull. He recovered after a short stay in the hospital.

The police found Wayne's house ransacked. They found several jewelry items and a camera in a pillowcase, apparently dropped by the intruder. Marks on the kitchen door indicated the house had been forcibly entered.

Phyllis Soden, who had known defendant for several years, returned to her home from work at about 4 a.m. on 4 December 1980. Shortly after 9 a.m. defendant went to her home and stated that he needed her to take him some place immediately. Leaving his dirty brown Ford in her driveway, the two departed in her automobile. Defendant directed her to drive on the Old Salisbury Road. As they neared the Shinn home he told her to stop, let him out, drive a short distance farther, turn around, and return to pick him up. She followed defendant's directions. When she returned, he ran to the car carrying a crowbar.

After they returned to Ms. Soden's home, defendant explained that he had broken into a house and had left the crowbar there. He wanted to retrieve the bar because it might have his fingerprints on it. A little while later, defendant showed her a wallet and removed the money from it. Thereafter, he told her: He had broken into a house after hearing that the residents had gold and jewelry. He found some items and stuffed them into a pillowcase. As he was preparing to leave, a man entered the patio door. He pointed his gun at the man who put up his hands. He ordered the man to turn around and shot him in the back of his head. After the man fell, he ran out of the house. When he left

the house, he saw another man approaching the patio. The other man turned, ran and entered a truck. He ordered the man out of the truck; and, although the man begged defendant not to shoot, defendant forced him to walk toward the patio and shot him in the back of his head. He was confident both of the other men were dead because he shot them at close range. He killed them to eliminate witnesses because he did not want to go back to prison.

Defendant offered no evidence at the guilt-determination phase of the trial.

The jury convicted defendant of assault with a deadly weapon with intent to kill inflicting serious injury upon Buren Shinn and felonious breaking of the home of Wayne Shinn. It also convicted him of the first degree murder of Wayne Shinn.

The following transpired at the sentencing phase of the murder case. Outside the presence of the jury defendant was examined under oath by his counsel. During this examination defendant testified that his counsel had fully advised him regarding the nature of the sentencing phase of the proceeding. Defendant also acknowledged that on 6 June 1981 he signed an affidavit in which he acknowledged that he told his attorney, Mr. Johnson,

> on at least five separate occasions . . . that should I be found guilty, then in the second trial dealing with punishment, I wished to have my attorney seek and request the death penalty. I do not wish to spend the rest of my life in jail. I had rather have the death penalty than a life term. I understand my right to a second trial at which the jury will consider both mitigating and aggravating circumstances. I have, nevertheless, for some months before the trial told my attorney I do not want a life sentence, but a death sentence and I want him to take such legal steps as may be necessary to see that the sentence is carried out.

The trial judge then advised defendant that notwithstanding his desire to be sentenced to death, the jury must make that decision and that the court by law was required to submit whatever aggravating and mitigating circumstances were supported by the evidence. The trial judge said, "Even though you may ask the jury to recommend the death sentence in this case, the jury is not

bound by it and the jury may . . . still see fit to recommend life imprisonment."

The jury was then brought back into the courtroom. Defendant testified before the jury that his criminal record consisted of "two cases of breaking and entering some years ago in Stanly County." He had assisted the state "involving some criminal matters in Stanly County some years ago." The following colloquy then occurred:

> Q. At this time would you tell the jury what your request is regarding their decision?
>
> A. I'd like the death penalty.
>
> Q. Would you care to tell us why you want the death penalty?
>
> A. To be locked up in prison for something I did not do, is truly cruel and inhuman. I didn't do it. I don't care what anybody says. I'm innocent. That to be put in prison for life that's not right. You think I done it, gas me.
>
> Q. And you're—you know what you're asking?
>
> A. Yes, sir.
>
> Q. You know it's my responsibility to try to save your life?
>
> A. Yes, sir.
>
> Q. That's all.

There was a brief cross-examination by the state during which defendant admitted that he owned a .32 caliber pistol in September 1980; he had attempted to purchase a pistol shortly after 4 December 1980; and on 4 December 1980 he had gone to Salisbury with Phyllis Soden. At the guilt phase of his trial a ballistics expert had testified that the bullet which killed Wayne Shinn was a .32 caliber bullet.

The jury found as aggravating circumstances that the murder of Wayne Shinn was "committed for the purpose of avoiding a lawful arrest" and was "part of a course of conduct in which [defendant] engaged and [which] include[d] the commission by the

defendant of other crimes of violence against [another person]."
*See* N.C. Gen. Stat. § 15A-2000(e)(4) & (11). The jury next found
that the aggravating circumstances were sufficiently substantial
to call for the imposition of the death penalty. Two specific
mitigating circumstances were submitted, *i.e.*, defendant had "no
significant history of prior criminal activity" and "defendant
testified truthfully on behalf of the prosecution in another prose-
cution of a felony." *See* N.C. Gen. Stat. § 15A-2000(f)(1) & (8). The
jury was also asked to consider whether any other circumstance
existed which it deemed to have mitigating value. *See* N.C. Gen.
Stat. § 15A-2000(f)(9). The jury did not specify which of the
mitigating circumstances it found, but it did indicate that it found
"one or more mitigating circumstances" to exist. The jury finally
found that the aggravating circumstances outweighed the mitigat-
ing circumstances and recommended that defendant be sentenced
to death.

## II.

### Guilt Phase

### A.

[1]  Defendant assigns error to the admission of Phyllis Soden's
testimony regarding statements he had made to her after the
shootings. Defendant says this testimony was inadmissible for the
reason that it was hearsay not falling within any exception to
the hearsay rule. We disagree.

Generally, out-of-court statements of a person offered
through a witness other than declarant to prove the truth of the
matter asserted in the statements is hearsay. *State v. Wood,* 306
N.C. 510, 294 S.E. 2d 310 (1982); 1 Brandis on North Carolina
Evidence, § 138 at 551-53 (2d rev. ed. 1982). A well-recognized ex-
ception to the hearsay rule, however, permits out-of-court admis-
sions of parties, including criminal defendants, to be related by a
witness to whom the admissions were made. *State v. Edwards,*
286 N.C. 140, 209 S.E. 2d 789 (1974); *State v. Porth,* 269 N.C. 329,
153 S.E. 2d 10 (1967); 2 Brandis, *supra,* § 167, at 6-10. Ms. Soden's
testimony concerning defendant's statements to her about the of-
fenses for which he was being tried were admissible under the
party admission exception to the hearsay rule.

### B.

[2]   Defendant contends it was error to admit testimony of police investigators relating Ms. Soden's prior statements to them made before and after defendant's arrest. At trial, Ms. Soden testified at length about defendant's admissions to her that he had shot both Wayne Shinn and Buren Shinn at close range when they had come upon him in Wayne Shinn's home after he had broken in and was attempting to steal various articles which he had collected in a pillowcase. She also testified to defendant's efforts to persuade her to be an alibi witness for him and to her consenting to permit defendant to hide his pistol used in the shootings at her home. She related further that she had made several statements to investigating officers and she gave, generally and in summary fashion, the content of those statements. The investigating officers were then permitted to testify to the statements made to them by Ms. Soden for the sole purpose of corroborating her in-court testimony. The statements did, in fact, corroborate her in-court testimony. The trial judge gave appropriate limiting instructions regarding the officers' testimony.

It was proper for the officers to testify regarding Ms. Soden's prior statements consistent with her in-court testimony to corroborate that testimony. *State v. Perry*, 298 N.C. 502, 259 S.E. 2d 496 (1979); *State v. Hopper*, 292 N.C. 580, 234 S.E. 2d 580 (1977).

### C.

[3]   Defendant assigns error to certain remarks made by the trial court, contending that the court impermissibly expressed an opinion to the jury.

The remarks of which defendant complains were made while Buren Shinn, one of the shooting victims, testified. The transcript indicates that he began testifying during the late afternoon. He had testified with respect to his being shot, carried to the hospital and treated for his injuries. He was then asked if he could identify the person who shot him. Defendant's objection necessitated a voir dire by the court. The following colloquy occurred:

> THE COURT: Sustained. Members of the jury, we have come to a point that requires you to not be in the courtroom

at this particular moment. Can I see you gentlemen here just one minute.

(Discussion at bench)

THE COURT: There is a matter at this particular point of the trial which requires that the Court do certain things in your absence prior to any testimony being heard by you at this particular stage of the trial. Now, I anticipate and the attorneys anticipate it to take longer than just a little while. So, I don't see any point in my leaving you in the jury room while we are doing this. I have no intentions of keeping you until after five and bringing you back in and start again. I'm going to let you go for the remainder of the day. However, I must admonish you at this time before I allow you to leave. We have plenty of work for us to do today. You must not discuss this case with anyone or allow anyone to discuss it with you. Do not discuss it even among yourselves. Keep an open mind about this case until you have heard the remainder of the evidence, the argument of counsel for the State and the Defendant, the charge of the Court and have gone to your jury room to deliberate. Then, and only then, are you allowed to talk about and discuss it. During the night recess, do not read anything in the newspapers about it, do not view anything on television or listen to anything on the radio regarding this matter. Keep an open mind about it and return in the morning to the jury room at nine-thirty. When you exit at this time, go on home for the night and I will see you folks in the morning at nine-thirty. Everybody else remain seated.

(Jury leaves courtroom)

THE COURT: A way of explanation and this is just an explanation. I'll tell you folks exactly what is going on. There comes times in the trial of cases where we must conduct as what is known as voir dire. That is we must determine whether or not an item is competent to be received into evidence before the jury. That's what we are just about to do. Mr. Shinn is going to be called upon to testify at this time regarding who he saw—

MR. BOWERS: May I approach the bench, sir?

THE COURT: Yes, sir.

(Discussion at bench)

THE COURT: I will not explain anything further to you at this time. Mr. District Attorney, you may continue.

Defendant argues that the trial court's comments (1) "emphasized to the jury that Mr. Shinn's testimony was extremely important"; (2) "implied that the judge personally was going to test the Shinn identification outside their presence to check its competence before he let them hear it"; and (3) "implied that Mr. Shinn obviously had seen the right man and that Mr. Shinn's identification was competent and thus believable because the judge brought [the jury] back in and allowed Mr. Shinn to testify. . . ." Defendant's argument relates only to those comments which follow immediately after the notation in the trial transcript "(Jury leaves courtroom)," yet defendant's argument seems to assume the jury heard the comments complained of. Defendant's argument must fail for several reasons.

First, this Court must assume that the jury had been excused and had left the courtroom when the remarks were made because this is what the trial transcript shows. Except as permitted by the evidentiary doctrine of judicial notice, *see* 6 Strong's North Carolina Index 3d *Evidence* §§ 1-3.7 (1977), this Court is bound on appeal by the record on appeal as certified and can judicially know only what appears in it. *State v. Gibbs*, 297 N.C. 410, 255 S.E. 2d 168 (1979); *State v. Williams*, 280 N.C. 132, 184 S.E. 2d 875 (1971). When, pursuant to App. R. 9(c)(1), the trial transcript, "as agreed to by the opposing party . . . or as settled by the trial tribunal," is filed by appellant in lieu of narrating the evidence in the record on appeal, as was done in this case, the trial transcript must be treated as part of the record on appeal for purposes of applying the rule that this Court is bound by what appears in the record on appeal. So far as this Court can know, therefore, the jury never heard the remarks of which defendant complains.

Second, assuming *arguendo* the jury heard the complained of comments, we find no error was committed. There is nothing in the comments to suggest, as defendant urges, that "Mr. Shinn's testimony was extremely important." Mr. Shinn was the only eyewitness to the shooting. The importance of his testimony was so

obvious that the jury must have known it without having to be told. Nevertheless, the trial court did not, as it should not have done, give undue emphasis to the importance of Mr. Shinn's testimony. It was not improper for the judge to tell the jury that he was going to rule on the competency of the proffered testimony. Trial judges frequently make rulings on competency of evidence in the presence of juries, and juries understand this to be one of the functions of the judge. Such rulings are not in themselves error. *See State v. Hooks,* 228 N.C. 689, 47 S.E. 2d 234 (1948). It cannot be error, therefore, for the trial judge to announce to the jury merely that he is going to determine in a proceeding out of their presence the competency of certain evidence. We see nothing in the comments to suggest that Mr. Shinn "had seen the right man" or that his testimony was "believable evidence." The trial judge said only Mr. Shinn would be called on to testify "regarding who he saw." This statement in no way suggests that the trial judge thought the person whom Mr. Shinn saw was the defendant or that Mr. Shinn's testimony on this point should be believed.

Finally, even if these comments could by some stretch of judicial imagination be deemed error, we are completely satisfied that had the error not been committed, a different result would not have been reached at trial. The evidence against defendant was overwhelming. It consisted not only of Mr. Shinn's eyewitness testimony but the testimony of a friend of defendant to whom defendant had admitted committing the crimes. The details of these admissions coincided precisely with facts uncovered by investigators and with Mr. Shinn's testimony. The trial judge in his final jury instruction carefully and at length told the jury that it was the "sole judge" of the credibility of each witness. He specifically instructed the jury, "The identification witness is a witness just like any other witness. That is, you should assess the credibility of the identification witness in the same way you would any other witness." Under the standard of N.C. Gen. Stat. § 15A-1443(a), no reversible error was committed.

We have dealt with all defendant's assigned errors. In addition, we have considered all of the trial proceedings which are in the record and transcript before us.[1] We find no error in the guilt phase of the trial.

---

1. The jury selection process was not contained in any document before us.

## III.

### Sentencing Phase

Defendant assigns as error the failure of the trial court to hold our death penalty statute unconstitutional. We find no merit in this assignment.

[4] Defendant argues, first, that our statute violates the Equal Protection of the Laws Clause of the Fourteenth Amendment because it affords the district attorney "unbridled" discretion in deciding against whom he will seek verdicts of first degree murder and the death penalty, and against whom he will seek verdicts of second degree murder and a lesser punishment. While defendant cites no authority, he contends that if unbridled discretion in juries to impose or not to impose the death penalty is unconstitutional, *see Woodson v. North Carolina,* 428 U.S. 280 (1976), then complete discretion on the part of district attorneys is unconstitutional.

In a hearing on his motion to have the statute declared unconstitutional, defendant called the district attorney as a witness. He testified, among other things, that he exercised broad discretion in deciding whether (1) he would seek a first degree murder verdict and a recommendation of the death penalty, or (2) he would seek a lesser verdict, or (3) he would accept a plea to a lesser degree of homicide. He had no statutory or any other kind of guidelines to follow in making these decisions. Often he declined to seek a first degree murder verdict and the death penalty because of a case's technical or evidentiary problems.

In *Oyler v. Boles,* 368 U.S. 448 (1962), the defendant challenged the constitutionality of West Virginia's habitual criminal statute on the ground that there was selective enforcement by the prosecution. In rejecting this challenge, the Court said:

[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection never were alleged.

*Id.* at 506 (citations omitted). In *State v. Cherry,* 298 N.C. 86, 103, 257 S.E. 2d 551, 562 (1979), *cert. denied,* 446 U.S. 941 (1980), the defendant claimed our death penalty procedure denied defendants constitutional due process because it placed no limits on the case calendaring prerogatives of the district attorney, who could, according to defendant, "calendar cases when he chooses, in front of whatever judge he chooses." In rejecting this argument, we said:

> Our courts have recognized that there may be selectivity in prosecutions and that the exercise of this prosecutorial prerogative does not reach constitutional proportion unless there be a showing that the selection was deliberately based upon 'an unjustifiable standard such as race, religion or other arbitrary classification.' [Citations, including *Oyler,* omitted.]

*Id.* Here, there is no allegation or even intimation that the district attorney had deliberately employed any "unjustifiable standard" in calendaring this or any other case involving the death penalty. The United States Supreme Court has rejected arguments identical to defendant's in the context of death penalty procedures. *Gregg v. Georgia,* 428 U.S. 153 (1976); *Proffitt v. Florida,* 428 U.S. 242 (1976).

Defendant fails to show that the district attorney based his decision to seek the death penalty in defendant's or any other death case upon unjustifiable standards like "race, religion or other arbitrary classification." The United States Supreme Court says the federal constitution does not prohibit the use of absolute prosecutorial discretion in determining which cases to prosecute for first degree murder so long as such discretionary decisions are not based on race, religion, or some other impermissible classification. We are not inclined to interpret our state constitution to require more.[2]

[5] Defendant attacks the constitutionality of our statute providing for review of judgment and sentence by this Court. *See* N.C. Gen. Stat. § 15A-2000(d). First, he contends that this Court must find facts, a function for which it has no jurisdiction. Second, he contends that the standards for review are unconstitutionally vague.

---

2. If prosecutors are to be "guided" in the exercise of this kind of discretion, we think it is the province of the legislature and not this Court to so provide.

Neither contention has merit. Section 15A-2000(d) provides, in pertinent part:

Review of Judgment and Sentence.—

(1) The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of North Carolina pursuant to procedures established by the Rules of Appellate Procedure. In its review, the Supreme Court shall consider the punishment imposed as well as any errors assigned on appeal.

(2) The sentence of death shall be overturned and a sentence of life imprisonment imposed in lieu thereof by the Supreme Court *upon a finding* that the record does not support the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, or *upon a finding* that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, or *upon a finding* that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The Supreme Court may suspend consideration of death penalty cases until such time as the court determines it is prepared to make the comparisons required under the provisions of this section. [Emphases supplied.]

Admittedly, this Court is not a fact-finding body. *See State v. Lamkins,* 286 N.C. 497, 212 S.E. 2d 106 (1975), *cert. denied,* 428 U.S. 909 (1976). "The Supreme Court shall have jurisdiction to review upon appeal any decision of the courts below, upon any matter of law or legal inference. . . ." N.C. Const. art. IV, § 12(1). While section 15A-2000(d)(2) uses the word "finding" in prescribing this Court's review of death sentences, a "finding of fact," as that term is generally understood, is not contemplated. Rather, "a finding," as used in the statute, means, rather, a "determination," or a "conclusion." The statute requires this Court to determine, as a matter of law, whether (1) the record supports the jury's finding of any aggravating circumstance upon which the trial court based its sentence of death, (2) the sentence of death was

imposed under the influence of passion, prejudice or any other arbitrary factor, or (3) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. The statute neither contemplates nor requires this Court to make factual findings.

Defendant argues that the terms "under the influence of passion, prejudice, or any other arbitrary factor" are unconstitutionally vague. Statutes containing identical or similar words have been upheld against vagueness challenges. *Gregg v. Georgia,* 428 U.S. at 166-67, 204-06. We agree with the Supreme Court's interpretation of the federal constitution on this point, and we are not inclined to interpret our state constitution any differently.

## IV.

### Proportionality

[6]   Having found no error in the guilt or sentencing phase of the trial, we must now consider whether (1) "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor" and (2) "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C. Gen. Stat. 15A-2000(d)(2).

We can find, and defendant has pointed to, nothing in the record which suggests that the sentence of death was influenced by "passion, prejudice, or any other arbitrary factor." The case was carefully and meticulously tried. The trial judge was assiduous at every stage to protect defendant's rights. The evidence of guilt was overwhelming. Defendant, against the advice of counsel, offered little, if anything, in mitigation of his sentence. Indeed defendant told the jury he preferred the death penalty to life imprisonment. The jury was carefully instructed at the sentencing phase regarding its duties under our capital sentencing statute. The instructions were in accordance with our case law on the subject. The jury was instructed that if it found the existence of aggravating and mitigating circumstances it

> must weigh the aggravating circumstances against the mitigating circumstances. In so doing, you are the sole judges of the weight to be given to any individual circumstance which

you find, whether aggravating or mitigating. Your weighing should not consist of merely adding up the number of aggravating circumstances and mitigating circumstances. Rather, you must decide from all the evidence what value to give each circumstance and then weigh the aggravating circumstances against the mitigating circumstances so valued and finally determine whether the aggravating circumstances outweigh the mitigating circumstances.[3]

Nothing in the record before us suggests that the jury's ultimate determination of defendant's death sentence was based on anything other than its careful weighing of the aggravating against the mitigating circumstances in accordance with our capital sentencing statute.

Coming now to the question of whether the death sentence in this case "is excessive or disproportionate to the penalty imposed in similar cases, we note first our holding in *State v. D. Williams,* 308 N.C. 47, 301 S.E. 2d 335, *cert. denied,* 104 S.Ct. 202 (1983):

In comparing 'similar cases' for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* at 79, 301 S.E. 2d at 355. The pool "includes only those cases which have been affirmed by this Court." *State v. Jackson,* 309 N.C. 26, 45, 305 S.E. 2d 703, 717 (1983). In conducting our proportionality review, we do not "necessarily feel bound . . . to give a citation to every case in the pool of 'similar cases' used for comparison." *State v. D. Williams,* 308 N.C. at 81, 301 S.E. 2d at 356.

---

3. Although the trial judge here correctly conveyed to the jury its duty to weigh the mitigating against the aggravating circumstances, see *State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308 (1983), for this Court's recommendation of a different ordering of the ultimate issues so as to better insure that the jury properly engages in the weighing process.

In *D. Williams*, we also described briefly the methods we employ in making our comparisons. *Id.* at 80-82, 301 S.E. 2d at 355-57.

In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

Essentially, this case involves the murder of the owner of a dwelling and the attempted murder of the owner's father, both of whom caught defendant burglarizing the dwelling. Both the murder and the attempted murder were accomplished as a result of defendant's careful, cold and calculated determination that he would prefer murdering these persons to risking their being able to testify against him and possibly send him back to prison. At the sentencing hearing defendant told the jury that if it believed he committed the murder, "gas me" and "I'd like the death penalty." Defendant offered little in mitigation of the murder. The jury, on supporting evidence, concluded that the murder was aggravated because it was committed to avoid arrest and was part of a course of conduct which involved a crime of violence against another person. Since the jury did not specify which mitigating circumstances it found and specified that it found "one or more," we must assume for purposes of proportionality review that the jury found both mitigating circumstances submitted, *i.e.*, that defendant had no significant criminal history and had testified for the prosecution in another felony case.

We note that of the fourteen cases in the pool in which a death sentence has been affirmed by this Court,[4] seven of them

---

4. *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Craig and Anthony,* 308 N.C. 446, 302 S.E. 2d 740, *cert. denied,* 104 S.Ct. 263 (1983); *State v. D.*

State v. Lawson

were cases in which the jury found the aggravating factor that defendant engaged in a course of conduct involving violence against another person.[5] In *Williams II* the *only* aggravating circumstance submitted and found by the jury was that defendant engaged in such a course of conduct. Further, the jury found as a mitigating circumstance, among others, that defendant had no significant history of prior criminal activity. *Williams II* involved the shooting of an employee of a service station during an armed robbery of the station. At the sentencing phase the state offered evidence of another robbery murder committed by defendant on the same evening as part of a course of conduct involving both robbery murders. *D. Williams* is like the instant case in that it involved the murder of the occupant of a private dwelling when defendant, bent on burglarizing the dwelling he thought was unoccupied, was surprised by the occupant. It is true that in *D. Williams* defendant also sexually molested the victim and the jury found the crime to be especially heinous; but there were no crimes of violence committed against other persons. *Oliver* also is like the instant case in that it involved the murder of an armed robbery victim for the purpose of avoiding arrest, *i.e.*, to eliminate an eyewitness. There was also another murder committed in that case by Oliver's accomplice, Moore; although the "course of conduct" aggravating circumstance was not submitted to the jury.

---

*Williams,* 308 N.C. 47, 301 S.E. 2d 335, *cert. denied,* 104 S.Ct. 202 (1983); *State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308 (1983); *State v. Brown,* 306 N.C. 151, 293 S.E. 2d 569, *cert. denied,* 103 S.Ct. 503 (1982); *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* 103 S.Ct. 474 (1982); *State v. Smith,* 305 N.C. 691, 292 S.E. 2d 264, *cert. denied,* 103 S.Ct. 474 (1982); *State v. Williams II,* 305 N.C. 656, 292 S.E. 2d 243, *cert. denied,* 103 S.Ct. 474 (1982); *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied,* 103 S.Ct. 3552 (1983); *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied,* 455 U.S. 1038 (1982); *State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981); *State v. Martin,* 303 N.C. 246, 278 S.E. 2d 214, *cert. denied,* 454 U.S. 933 (1981); *State v. McDowell,* 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied,* 450 U.S. 1025 (1981); *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907 (1980).

5. *Craig and Anthony,* 308 N.C. at 450, 302 S.E. 2d at 743; *McDougall,* 308 N.C. at 16, 301 S.E. 2d at 318; *Brown,* 306 N.C. at 161, 293 S.E. 2d at 577; *Pinch,* 306 N.C. at 7, 292 S.E. 2d at 212; *Williams II,* 305 N.C. at 680, 292 S.E. 2d at 249; *Hutchins,* 303 N.C. at 347, 279 S.E. 2d at 804; *McDowell,* 301 N.C. at 283, 271 S.E. 2d at 290.

We recognize, on the other hand, that in a number of robbery murder cases, juries have imposed sentences of life imprisonment rather than death.[6] Of these cases, only in *Barnette* did the jury find that the capital offense was committed during a course of conduct in which defendant committed crimes of violence against others. In *Barnette*, however, the jury found one or more of various mitigating circumstances which included that defendant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C. Gen. Stat. § 15A-2000(f)(6). Likewise in *Booker* the jury found one or more of a number of mitigating circumstances which included the impaired capacity of defendant and the circumstance that defendant when the crime was committed "was under the influence of mental or emotional disturbance." *Id.* § 2000(f)(2). In *Hill* the jury did find that defendant knowingly created a risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more than one person as an aggravating circumstance; but the jury found as a mitigating circumstance that defendant was under the influence of a mental or emotional disturbance at the time of his crime. In *Crews* two defendants, Crews and Turpin, were convicted of two murders committed at the same time, the cases being joined for trial and sentencing. The jury did find in mitigation that Crews "up to the time of his departure, AWOL, from the U.S. Army, . . . enjoyed a good reputation in his home community and his promotion in the U.S. Army substantiated this reputation." It found that Turpin acted under duress or domination of another and was under the influence of a mental or emotional disturbance. It found both defendants had no significant history of criminal activity. Crews committed one murder and Turpin the other. Crews put up a relatively strong case in mitigation at the sentencing hearing. It included the testimony of seven family members who told of his

6. *State v. Abdullah,* 309 N.C. 63, 306 S.E. 2d 100 (1983); *State v. Hill,* 308 N.C. 382, 302 S.E. 2d 202 (1983); *State v. Barnette,* 307 N.C. 608, 300 S.E. 2d 340 (1983); *State v. Alston,* 307 N.C. 321, 298 S.E. 2d 631 (1983); *State v. Booker,* 306 N.C. 302, 293 S.E. 2d 78 (1982); *State v. Hunt,* 305 N.C. 238, 287 S.E. 2d 818 (1982); *State v. Elkerson,* 304 N.C. 658, 285 S.E. 2d 784 (1982); *State v. Murvin,* 304 N.C. 523, 284 S.E. 2d 289 (1981); *State v. Rinck,* 303 N.C. 551, 280 S.E. 2d 912 (1981); *State v. Miller,* 302 N.C. 572, 276 S.E. 2d 417 (1981); *State v. Moore,* 301 N.C. 262, 271 S.E. 2d 242 (1980); *State v. Smith,* 301 N.C. 695, 272 S.E. 2d 852 (1980); *State v. Crews,* 296 N.C. 607, 252 S.E. 2d 745 (1979).

good reputation in the community where he lived. He also denied participating in the murders, but admitted being with his accomplices. In *Elkerson, Murvin, Rinck,* and *Alston,* no sentencing hearings were conducted because there was no evidence of any aggravating circumstances. In *Abdullah,* at this writing, we have no information regarding the aggravating or mitigating circumstances submitted to or found by the jury.

The aggravating circumstance that the capital crime was committed during a course of conduct which included crimes of violence against another person is common to half the cases in which this Court has affirmed death sentences. Even in the presence of this factor, however, or other similar factors, juries in *Barnette* and *Hill* did not impose the death penalty where they also found defendant's capacity to appreciate the criminality of his act or to conform his conduct to law was impaired or that defendant was under a mental or emotional disturbance, or both. Here defendant did commit a capital murder in the course of which he also committed a crime of violence against another person. Indeed that crime of violence was an attempted murder itself. There is no suggestion in the case that defendant's mental capacity was impaired or that he was under the influence of a mental or emotional disturbance. All the evidence shows that the murder and the attempted murder were coldly and calculatedly perpetrated because defendant did not want to leave any witnesses who might send him back to prison. In *Oliver,* in sustaining on proportionality review a death sentence, this Court said:

> In the case of defendant Oliver's murder of Dayton Hodge, we hold as a matter of law that the sentence is neither disproportionate nor excessive considering both the crime and this defendant. Murder can be motivated by emotions such as greed, jealously, hate, revenge, or passion. The motive of witness elimination lacks even the excuse of emotion.

309 N.C. at 375, 307 S.E. 2d at 335. So it is here.

Because juries have returned death sentences in a number of cases similar to this one and the cases in which juries have returned life imprisonment are for the most part distinguishable on the basis of the absence of an aggravating factor present in this case or the presence of mitigating factors absent in this case, we

conclude that the sentence of death in this case is not excessive or disproportionate to penalties imposed in similar cases, considering both the circumstances under which the crime was committed and the character, background and mental state of defendant.

Consequently, in defendant's trial and sentencing hearing, we find

No error.

Justices MARTIN and FRYE did not participate in the consideration or decision of this case.