**David LAWSON, Petitioner–Appellant,**

**v.**

**Gary DIXON, Warden, Central Prison, Raleigh, North Carolina, Respondent–Appellee. (Two Cases)**

**Nos. 92–4003, 92–4004.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 3, 1992.

Decided Aug. 26, 1993.

744

Marshall Lawrence Dayan, Office of Appellate Defender, North Carolina Resource Center, Raleigh, NC, argued (Harry L. Harkins, Jr., Atlanta, GA, on brief), for petitioner-appellant.

Joan Herre Byers, Sp. Deputy Atty. Gen., North Carolina Dept. of Justice, Raleigh, NC, argued (Lacy H. Thornburg, Atty. Gen. of North Carolina, Barry S. McNeill, Sp. Deputy Atty. Gen., on brief), for respondent-appellee.

Before ERVIN, Chief Judge, and WIDENER and NIEMEYER, Circuit Judges.

## OPINION

ERVIN, Chief Judge:

These consolidated appeals arise from the district court's dismissal of David Lawson's petition for the writ of habeas corpus, 28 U.S.C. § 2254, and concomitant denial of his motion for relief from judgment, Fed. R.Civ.P. 60(b). Finding no merit in Lawson's five assignments of error to the judgments below, we affirm.

I

A detailed recitation of the facts surrounding the crimes of which Lawson was convicted may be found in the opinion of the Supreme Court of North Carolina on direct appeal. *See State v. Lawson,* 310 N.C. 632, 634–38, 314 S.E.2d 493, 495–96 (1984). The following paragraphs summarize this factual

background and the criminal proceedings it spawned.

In December 1980 Buren Shinn and his son Wayne resided in houses approximately 100 yards apart on Old Salisbury Road some three miles from Concord, North Carolina. Buren and Wayne worked together in a family electrical repair business headquartered at Buren's house. After driving to work early on the morning of December 4, 1980, Wayne heard the burglar alarm sound in his own house. Buren and Wayne immediately leapt into Wayne's truck and proceeded to Wayne's house, where they observed a dirty, brown Ford automobile parked in the driveway. Wayne left the truck and ran towards the patio that lay on one side of the house. Buren saw Wayne throw up his hands and walk through a set of sliding glass doors, whereupon Buren heard two or three shots ring out. Buren ran to the truck, got in, and began backing the truck in an effort to escape. A man ran towards him, waving a pistol. His attention diverted, Buren backed the truck into a ditch. The man approached the truck and ordered Buren to get out and move towards Wayne's house. Buren did so, pleading with the man not to hurt him.

Before Buren reached the patio, he heard another gun shot and felt a sharp blow to his head. He fell to the ground, unconscious. When Buren regained consciousness he found himself lying in a large pool of blood. Fearing that his assailant might still be in the vicinity, he kept silent. Some twenty or thirty minutes later, Buren heard someone walk toward him and felt a hand reach into his pocket and remove his wallet. Buren remained motionless for twenty more minutes. Hearing no footsteps and seeing no one, he began to crawl from the patio toward the road, hoping to halt a passing car. When no one stopped, he struggled to his feet and walked home. After telephoning for help, Buren's second son, Jerry, left to check on his brother's condition. Law enforcement officers arrived at Wayne's house and found him lying in a pool of blood in the basement near the patio. Wayne and Buren were taken to a hospital where Wayne was pronounced dead as the result of a bullet wound to the head. Buren's injuries were not se-

vere, for the bullet which struck him did not penetrate the skull. He recovered after a short hospital stay.

The police found Wayne's house ransacked. They discovered a pillowcase containing several pieces of jewelry and a camera, apparently dropped by the intruder. Marks on the kitchen door indicated that the house had been forcibly entered.

David Lawson was charged in the Superior Court of Cabarrus County with three crimes: (1) the first-degree murder of Wayne Shinn; (2) the assault with a deadly weapon with intent to kill inflicting serious injury on Buren Shinn; and (3) the felonious breaking and entering of the home of Wayne Shinn. The State's case-in-chief consisted primarily of the testimony of two witnesses: Buren Shinn and Phyllis Soden. When Buren Shinn took the stand, he identified Lawson as his assailant, and related the facts set forth above. Phyllis Soden, with whom Lawson once had shared a residence, testified that she returned home from work at about 4:00 a.m. on December 4, 1980. Shortly after 9:00 a.m. Lawson arrived at Soden's house and stated that he needed her to "take him someplace immediately." Leaving his brown Ford in her driveway, the two departed in her automobile. Lawson directed Soden to drive on Old Salisbury Road. As they neared Wayne Shinn's residence Lawson told Soden to stop, let him out, drive a short distance farther, turn around, and return to pick him up. Soden followed Lawson's directions. When she returned to Shinn's house, Lawson ran to the car carrying a crowbar. After they returned to Soden's residence, Lawson explained that he had broken into a house and left the crowbar there. Fearing that the crowbar might have his fingerprints on it, he had been anxious to retrieve it. A little later Lawson showed Soden a wallet and removed the money from it. He told Soden that he had broken into a house after hearing that the residents had gold and jewelry.

According to Soden's testimony, Lawson told her that he had found some items in the house and stuffed them into a pillowcase. As he was preparing to leave, a man entered the patio door. Lawson pointed his gun at the man, who promptly put up his hands. Law-

son then ordered the man to turn around, whereupon he shot him in the back of the head. After the man fell, Lawson ran out of the house and spied another man approaching the patio. The other man turned, ran, and got into a truck. Lawson ordered the man out of the truck. Although the man begged Lawson not to shoot, Lawson forced him to walk toward the patio and shot him in the back of the head. He was confident that both men were dead because he shot them at close range. Lawson killed them, according to Soden, both in order to eliminate witnesses to the robbery and because he did not want to "go back to prison."

Lawson offered no evidence during the guilt-innocence phase of the trial. After the jury returned guilty verdicts on all three charges, the proceedings turned to a consideration of sentence. In open court but outside the presence of the jury, Lawson was examined under oath by his attorney, James C. Johnson. During this examination Lawson testified that Mr. Johnson had fully advised him regarding the nature of the sentencing phase of the proceeding. Lawson also acknowledged that on June 6, 1981 he signed an affidavit in which he acknowledged that he told Mr. Johnson

> on at least five occasions ... that I should be found guilty, then in the second trial dealing with punishment, I wished to have my attorney seek and request the death penalty. I do not wish to spend the rest of my life in jail. I had rather have the death penalty than a life term. I understand my right to a second trial at which the jury will consider both mitigating and aggravating circumstances. I have, nevertheless, for some months before the trial told my attorney I do not want a life sentence, but a death sentence and I want him to take such legal steps as may be necessary to see that the sentence is carried out.

The superior court then advised Lawson that, notwithstanding his desire to be sentenced to death, the jury must decide his punishment and that the court was required by law to submit whatever aggravating and mitigating circumstances were supported by the evidence to the jury for consideration. The court stated: "Even though you may ask the jury to recommend the death sentence in this case, the jury is not bound by it and the jury may ... still see fit to recommend life imprisonment."

The jury was then brought back into the courtroom. Lawson testified before the jury that his criminal record consisted of "two cases of breaking and entering some years ago in Stanly County." He had assisted the State "involving some criminal matters in Stanly County some years ago." The following colloquy then took place between Lawson and his attorney:

Q: At this time would you tell the jury what your request is regarding their decision?

A: I'd like the death penalty.

Q: Would you care to tell us why you want the death penalty?

A: To be locked up in prison for something I did not do, is truly cruel and inhuman. I didn't do it. I don't care what anybody says. I'm innocent. That to be put in prison for life, that's not right. You think I done it, gas me.

Q: And you're—you know what you're asking?

A: Yes, sir.

Q: You know it's my responsibility to try to save your life?

A: Yes, sir.

Q: That's all.

A brief cross examination by the state followed, during which Lawson admitted that he owned a .32 calibre pistol in September 1980; that he attempted to purchase a pistol shortly after December 4, 1980; and that on December 4, 1980 he had gone to Salisbury with Phyllis Soden. At the guilt-innocence phase of the trial, a ballistics expert had testified that the bullet which killed Wayne Shinn was a .32 calibre bullet.

The jury found as aggravating circumstances that the murder of Wayne Shinn was "committed for the purpose of avoiding a lawful arrest" and was "part of a course of conduct in which [Lawson] engaged and [which] include[d] the commission by the defendant of other crimes of violence against [another person]." *See* N.C.Gen.Stat. § 15A–2000(e)(4) & (11) (1988 & Supp.1992).

The jury next found that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty. Two specific mitigating circumstances were submitted: (1) that Lawson had no "significant prior history of criminal activity," and (2) that Lawson "testified truthfully on behalf of the prosecution in another prosecution of a felony." *See id.* § 15A–2000(f)(1) & (8). The jury also was asked to consider whether any other circumstances existed which it deemed to have mitigating value. *See id.* § 15A–2000(f)(9). The jury did not specify which of the mitigating circumstances it found, but it did indicate that it found the existence of "one or more mitigating circumstances." The jury finally found that the aggravating circumstances outweighed the mitigating circumstances and recommended that Lawson be sentenced to death by administration of lethal gas.

Following affirmance of his convictions and death sentence by the Supreme Court of North Carolina, *see State v. Lawson*, 310 N.C. 632, 634, 314 S.E.2d 493, 495 (1984), and the denial of his petition for the writ of certiorari by the Supreme Court of the United States, *see Lawson v. North Carolina*, 471 U.S. 1120, 105 S.Ct. 2368, 86 L.Ed.2d 267 (1985), Lawson filed a motion for appropriate relief pursuant to N.C.Gen.Stat. § 15A–1411 (1988 & Supp.1992) in the Superior Court of Cabarrus County, raising claims of ineffective assistance of counsel at trial and on direct appeal.[1] Lawson's motion also challenged the impartiality of the jury empaneled to try his case and the sufficiency of the evidence supporting the aggravating circumstances as found by the jury. Later Lawson amended his motion for appropriate relief to challenge the State's excusal for cause of jurors with scruples against capital punishment. He then further amended it to allege (1) a claim of ineffective assistance of counsel

in failing to present mitigating evidence at the penalty phase of the trial; (2) the absence of a reliable sentencing determination because of the absence of mitigating evidence; (3) the unconstitutionality of a jury instruction imposing on the jury a duty to pronounce the death sentence if aggravating circumstances outweighed mitigating circumstances; and (4) ineffective assistance of counsel in failing to have transcribed and to present the closing arguments of counsel at trial to the Supreme Court of North Carolina for review. Following an evidentiary hearing, the superior court denied the motion for appropriate relief as amended. Both the Supreme Court of North Carolina, *see State v. Lawson*, 322 N.C. 114, 367 S.E.2d 919 (1988), and the Supreme Court of the United States, *see Lawson v. North Carolina*, 485 U.S. 1016, 108 S.Ct. 1494, 99 L.Ed.2d 883 (1988), denied Lawson's petitions for appellate review.

On July 12, 1988, assisted by new counsel, Lawson sought federal collateral relief by filing the instant petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Middle District of North Carolina. Lawson acknowledged that many of the claims raised by his petition had not been presented to the Superior Court of Cabarrus County in his motion for appropriate relief. The petition assigned multiple claims of constitutional error to the guilt-innocence and sentencing phases of his trial, and set forth in summary form the facts supporting each claim. Rather than await the dismissal of this "mixed" petition as required by *Rose v. Lundy*, 455 U.S. 509, 520–21, 102 S.Ct. 1198, 1204–05, 71 L.Ed.2d 379 (1982), Lawson expeditiously filed a second motion for appropriate relief in the Superior Court of Cabarrus County, raising the previously unexhausted claims that appeared in the habeas petition. Lawson

---

1. Specifically, Lawson claimed that James C. Johnson, his counsel in the trial and appellate proceedings before the state courts of North Carolina, had rendered him ineffective assistance of counsel with respect to (1) his motion to change venue; (2) jury selection; (3) the identification procedures employed at trial; (4) his failure adequately to challenge the sufficiency of the evidence to support aggravating factors at the penalty phase on direct appeal; (5) his failure ade-

quately to challenge the sufficiency of the evidence to support the jury's imposition of the death sentence; (6) his failure adequately to challenge the proportionality of the death sentence; (7) the preparation and filing of a petition for the writ of certiorari in the Supreme Court of the United States; and (8) the preparation of the record on appeal and the written brief in the Supreme Court of North Carolina.

asked the district court not to consider his habeas petition until the state remedies on claims first raised in the petition had been exhausted. The respondent,[2] objecting to Lawson's motion to hold the habeas petition in abeyance, asked the court to sever the exhausted from the unexhausted claims, adjudicate only the exhausted claims, and consider the unexhausted claims in a subsequent petition after the state courts had been afforded an opportunity to rule upon them. The district court rejected this approach, and referred the petition to a magistrate judge for recommended findings of fact and conclusions of law as permitted by 28 U.S.C. § 636(b)(1)(B).

The magistrate judge recommended that the petition be dismissed as "mixed" under *Rose v. Lundy.* The district court agreed, dismissed the petition, and dissolved the stay of execution it had entered to permit Lawson to seek federal collateral relief. In a motion to alter or amend judgment and a motion for relief from order brought pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, the respondent then repeated his request that the court not dismiss the petition but sever the unexhausted claims and adjudicate only the exhausted claims. The respondent filed a written statement specifically indicating that he would unconditionally waive the defense of nonexhaustion of state remedies if his motion to alter or amend was allowed.

On the basis of this promised waiver, the district court granted the respondent's motion, amended its judgment, and vacated its order dismissing the petition for failure to exhaust state remedies completely as to all claims raised in Lawson's habeas petition. The court rejected the respondent's proposal to sever the exhausted from the unexhausted claims and adjudicate only the exhausted claims. The court also rejected the respondent's alternative proposal that the court consider the exhausted as well as the unexhausted claims only on the record developed before and during direct appeal to the Supreme Court of North Carolina and on Law-

son's first Motion for Appropriate Relief in the Superior Court of Cabarrus County.

On April 6, 1989 the magistrate judge heard oral argument on the issues raised by Lawson's petition, and held the litigation in abeyance pending disposition of state-court proceedings for reconsideration in light of *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). On November 19, 1991 the magistrate judge filed an order recommending that Lawson's petition be dismissed and that his motions for discovery, appointment of a psychiatric expert, and an evidentiary hearing be denied. *See Lawson v. Dixon,* No. C–88–738–S, slip op. at 7 (M.D.N.C. Nov. 19, 1991) (order and recommendation of United States Magistrate Judge). The district court adopted the magistrate judge's recommendations, and entered a judgment dismissing the petition on January 7, 1992. *See Lawson v. Dixon,* No. C–88–738–S, slip op. at 1–2 (M.D.N.C. Jan. 7, 1992) (judgment and order). Lawson then moved to alter or amend the judgment, and further moved for relief from the judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure based on our decision in *Williams v. Dixon,* 961 F.2d 448, 451–59 (4th Cir.), *cert. denied* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992); both motions were denied.

Lawson gave notice of appeal as to both the dismissal of his petition and the denial of his Rule 60(b) motion. The appeals were consolidated for briefing and argument herein.

## II

Certain aspects of the district court's treatment of Lawson's motion for the appointment of a psychiatric expert are relevant to the issues raised by these appeals. In his petition for the writ, Lawson raised four principal claims regarding the effect of his psychological health upon the guilt-innocence and sentencing phases of his trial. Specifically, he alleged (1) that he was not competent to be sentenced; (2) that he lacked sufficient ability to consult with his

---

**2.** The respondent, Gary T. Dixon, is warden of Central Prison in Raleigh, North Carolina, where

Lawson presently is incarcerated.

counsel with a reasonable degree of rational understanding and with a view to preparing his defense; (3) that he was not competent to, and did not, knowingly, intelligently, and voluntarily waive his constitutional right to a reliable sentencing determination; and (4) that his death sentence was rendered in the absence of a reliable sentencing hearing. On February 1, 1989, after his petition had been laid before the district court, Lawson filed, *ex parte*, a motion for the appointment of a psychiatric expert to assist in the development and presentation of his mental-health habeas claims, or in the alternative for an *ex parte* evidentiary hearing in which he would have the opportunity to show that expert psychiatric services were reasonably necessary to the full and fair adjudication of these claims. This motion was predicated upon provisions of the Criminal Justice Act, 18 U.S.C. § 3006A(e), and the Anti–Drug Abuse Act of 1988, 21 U.S.C. §§ 848(q)(4)(B) and (q)(9).

On April 4, 1989, acting *sua sponte*,[3] the magistrate judge held a hearing at which Lawson was required to reveal to the respondent the basis for his motion to appoint a psychiatric expert. After the hearing, the magistrate judge required Lawson to brief and identify those habeas claims for which he had requested an evidentiary hearing on the appointment motion. The respondent replied with a motion to dismiss the petition in its entirety, contending that the appointment motion so altered Lawson's habeas petition that it raised a new, unexhausted claim. Ac-

cording to the respondent, this new claim rendered the petition "mixed"—and therefore subject to dismissal—under *Rose v. Lundy*, 455 U.S. 509, 520–21, 102 S.Ct. 1198, 1204–05, 71 L.Ed.2d 379 (1982).

In his recommended findings of fact and conclusions of law, issued on November 19, 1991, the magistrate judge determined that Lawson's effort to expand his mental competency allegations with a new opinion from a psychiatric expert constituted a "significantly different claim" involving "critical factual evidence which would attempt to markedly improve the posture of [Lawson's] claim." *See Lawson v. Dixon*, No. C–88–738–S, slip op. at 16 (M.D.N.C. Nov. 19, 1991) (order and recommendation of United States Magistrate Judge). Because the psychiatrist's testimony would have been the first evidence from any expert indicating possible mental incompetency, the magistrate judge held that Lawson's motion constituted a new (and therefore unexhausted) claim. *Id.* The magistrate judge further held, however, that the respondent should not be permitted to withdraw his unconditional waiver of exhaustion[4] simply because Lawson was attempting to introduce additional proof in support of his factual allegation of incompetency, which had been among the claims directly subject to the respondent's waiver. *Id.* at 17. The magistrate judge reasoned, *inter alia*, that the respondent should have known that the district court would not restrict its review of Lawson's claim to the record before the state

---

3. At the hearing on Lawson's motion, the magistrate judge made it clear that he had summoned both parties *sua sponte* to discuss the motion's impact on Lawson's habeas petition generally. *See, e.g.,* J.A. 742 (magistrate judge stating that "[t]he reason why I called you gentlemen is that I received an ex parte motion from the petitioner with respect to requesting the appointment of a psychiatric expert"); *id.* 744 (magistrate judge stating that "I just thought I'd call a hearing [to resolve Lawson's motion]").

4. The magistrate judge properly recognized that exhaustion is not a jurisdictional requirement, but rather arises from interests of comity between the state and federal courts. Indeed, whether a federal court of appeals should require exhaustion is under some circumstances discretionary. *See Granberry v. Greer*, 481 U.S. 129, 132–36, 107 S.Ct. 1671, 1674–76, 95 L.Ed.2d 119 (1987). Because exhaustion is not a jurisdictional bar, the state may waive it. *Id.* Yet the

waiver must be unconditional. *See Sweezy v. Garrison*, 694 F.2d 331, 331 (4th Cir.1982) (per curiam), *cert. denied*, 461 U.S. 908, 103 S.Ct. 1882, 76 L.Ed.2d 812 (1983); *Harding v. North Carolina*, 683 F.2d 850, 852–53 (4th Cir.1982) (holding conditional waiver "flatly incompatible" with the spirit of the comity considerations inherent in the exhaustion requirement).

Although the instant case does not present, and we do not reach, the question of when a state's waiver of exhaustion as to particular issues in a section 2254 petition ought to be accepted or rejected, we agree with the Eighth and Eleventh Circuit Courts of Appeals that district courts have discretion to do either. *See Purnell v. Missouri Dep't of Corrections*, 753 F.2d 703, 708–10 (8th Cir.1985); *Thompson v. Wainwright*, 714 F.2d 1495, 1509 (11th Cir.1983), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984).

courts, as the respondent already had sought unsuccessfully to limit the court's consideration of the petition to the record previously developed before the state tribunals. *Id.* at 17–18.

Because neither party directly challenges on appeal the validity of the magistrate judge's holding with respect to the respondent's waiver of exhaustion, the question before us involves only the merits of the judge's denial of Lawson's motion. The magistrate judge denied Lawson's request for the appointment of a psychiatric expert because Lawson had "failed to show the necessity" for the appointment. *Lawson v. Dixon,* No. C–88–738–S, slip op. at 7 (M.D.N.C. Nov. 19, 1991) (order and recommendation of United States Magistrate Judge). After reviewing the supporting affidavit of the psychiatrist Lawson asked the court to appoint, the magistrate judge held that Lawson was not entitled to relief or to an evidentiary hearing on his appointment motion. *See id.*

### III

Lawson now assigns error to three aspects of the district court's denial of his motion for appointment of a psychiatric expert. First, he contends that the magistrate judge erred by failing to hold *ex parte* proceedings to adjudicate his motion. Second, he urges that the court applied incorrect legal standards in deciding the motion. Third, he argues that the court's conclusions of fact are not fairly supported by the record as a whole. We address these contentions seriatim.

### A

By far the thorniest issue the instant appeal presents is Lawson's claim that the district court's judgment should be reversed because the magistrate judge failed to hold an *ex parte* proceeding to adjudicate his appointment ·motion. The question is one of law; we therefore review the decision below *de novo. See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 508 & n. 27, 104 S.Ct. 1949, 1959, 1964 & n. 27, 80 L.Ed.2d 502 (1984).

■ Lawson's motion clearly invoked both 18 U.S.C. § 3006A(e) and 21 U.S.C.

§§ 848(q)(4)(B) and (q)(9) as alternative grounds for the appointment of a psychiatric expert. These statutes provide that the district courts may appoint counsel and other experts to assist criminal defendants in judicial proceedings under certain circumstances. The principal difference between the Title 18 and Title 21 provisions lies in the litigative postures under which they afford defendants expert assistance.

18 U.S.C. § 3006A(e) provides in relevant part:

Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1). Thus, defendants who wish to have the assistance of experts at trial or in collateral-attack proceedings may apply for government funds to pay the cost of employing such experts pursuant to section 3006A(e)(1). If the district court or magistrate judge assigned to the case finds that the defendant cannot obtain the desired services on the strength of his own purse, the court must authorize the defendant's counsel to seek and employ such experts as are "necessary" to the defense. Therefore, appointment of an expert for purposes of mounting a defense at trial is mandatory under Title 18 if the defendant satisfies the statutory prerequisites of indigence and necessity.

■ By contrast, 21 U.S.C. § 848(q)(4)(B) and (q)(9), read together, provide counsel and expert services only in the context of post-conviction collateral attacks upon the validity of prior federal- and state-court convictions and sentences. Specifically, the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, § 7001(b), 102 Stat. 4181, 4193–94 (1989), amended section 408 of the Controlled Sub-

stances Act, 21 U.S.C. § 848, to provide counsel and ancillary support to certain defendants seeking to challenge a sentence of death in post-conviction proceedings under sections 2254 or 2255 of Title 28. The relevant portions of section 848(q)(4)(B) of Title 21 now state that

[i]n any post conviction proceeding under section 2254 or 2255 of Title 28, seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraph[ ] . . . (9).

21 U.S.C. § 848(q)(4)(B). Paragraph (9) of this subsection provides that

[u]pon a finding in ex parte proceedings that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the court shall authorize the defendant's attorneys to obtain such services on behalf of the defendant and shall order the payment of fees and expenses therefore [sic]. . . .

21 U.S.C. § 848(q)(9). By the terms of the statute, Congress mandated the application of federal funds for legal representation of habeas corpus petitioners as well as investigative, expert, and other services, provided the prisoner[5] can demonstrate that he is financially unable to secure the assistance on his own and that such assistance is "reasonably necessary" for his representation.

■ Whether a district court's failure to hold "ex parte proceedings" in order to adjudicate an appointment motion under 21 U.S.C. § 848(q)(9) constitutes reversible error is, so far as we are able to determine, a

question of first impression in the federal courts. The few cases that have arisen under the statute since its enactment have dealt exclusively with the merits of such appointments. See, e.g., In re Lindsey, 875 F.2d 1502, 1505–08 (11th Cir.1989) (per curiam). This paucity of authority is hardly surprising; the clear purpose of the statute is to provide counsel and experts for the assistance of habeas corpus petitioners, not to require the holding of ex parte proceedings for their own sake.

Yet it is equally plain that the statute contemplates ex parte proceedings as the proper device for adjudicating appointment motions. We observe that 18 U.S.C. § 3006A(e), the analogous appointment provision of the Criminal Justice Act, has been interpreted as virtually guaranteeing that decisions on expert-appointment motions will be made, as that statute requires, "after appropriate inquiry in an ex parte proceeding." 18 U.S.C. § 3006A(e)(1). See United States v. Chavis, 476 F.2d 1137, 1141–42 (D.C.Cir. 1973) (stating that "[a] defendant's indigency [sic] and need for assistance under § 3006A is to be determined by an ex parte proceeding"); United States v. Hamlet, 456 F.2d 1284, 1285 (5th Cir.1972) (per curiam) (holding that "the trial court erred in denying the § 3006A motion without conducting the ex parte inquiry required by the statute"); United States v. Theriault, 440 F.2d 713, 715 (5th Cir.1971) (same). We agree without hesitation that ex parte proceedings are the only proper means of adjudicating appointment motions contemplated by the language of both the Title 18 and Title 21 statutes. The plain language of section 848(q)(9) should not, therefore, be overlooked simply because (for example) the court prefers all such motions to be handled on the record.

5. In the absence of any meaningful legislative history of 21 U.S.C. §§ 848(q)(4)(B) and (q)(9), some might argue that the statute's counsel and expert-services provisions were intended to apply only to those federal death sentences imposed under the Anti–Drug Abuse Act, see 21 U.S.C. § 848(e), and not to state death-penalty cases under federal habeas corpus review. Such an interpretation would, in our view, fly in the face of the statute's plain meaning. Because death sentences imposed under the Act will be handed

down by federal courts for federal crimes, only one of the statutory predicates for section 848(q)(4)(B)—28 U.S.C. § 2255—would ever be used. Of course, 28 U.S.C. § 2254 is the primary vehicle by which state prisoners challenge state criminal judgments in federal court. We believe that by referring to section 2254, Congress clearly intended to create a counsel and expert-services guarantee in federal habeas review of state-imposed death sentences as well.

In this case, however, certain countervailing considerations are present. This matter already had assumed an advanced procedural posture when it came before the district court for decision. The respondent had waived the exhaustion requirement unconditionally with respect to all the claims in Lawson's habeas petition. The court was concerned that Lawson's motion for the appointment of an expert might result in an expansion of his mental-health claims beyond their scope in the habeas petition, and that the respondent would then move to dismiss the petition as "mixed" under *Rose v. Lundy*. Desiring to avoid the waste of judicial resources such a scenario would entail, the magistrate judge moved *sua sponte* to hold a hearing at which the effect of the expert's assistance on Lawson's habeas claims could be ascertained.

Under these circumstances, we hold that the magistrate judge's failure to adjudicate Lawson's motion "in an ex parte proceeding," 18 U.S.C. § 3006A(e)(1), or "in ex parte proceedings," 21 U.S.C. § 848(q)(9), was not reversible error. The court's action was a justifiable attempt to ensure that the factual allegations supporting Lawson's petition had been "fairly presented" to the state courts prior to federal habeas corpus review. *See Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). Because

> it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation[,]

federal courts apply the doctrine of comity, which

> teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.

*Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950); *see also Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982) (same); *Duckworth v. Serrano*, 454 U.S. 1, 2, 102 S.Ct. 18, 18, 70 L.Ed.2d 1 (1981) (per curiam) (noting that the exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights").

Where petitions for the Great Writ brought pursuant to 28 U.S.C. § 2254 are concerned, the responsibility for "rigorously enforcing [the] total exhaustion rule," *Rose*, 455 U.S. at 518, 102 S.Ct. at 1203, and thereby preserving comity between the federal and state judicial systems, necessarily falls upon the shoulders of the federal court with jurisdiction of the petition. Therefore, we conclude that it was proper for the magistrate judge to hold a hearing *sua sponte* to consider the exhaustion question presented by Lawson's motion. We emphasize that this holding, which effectively creates a narrow exception to the "ex parte proceeding" requirements of 18 U.S.C. § 3006A(e)(1) and 21 U.S.C. § 848(q)(9), is limited to motions made *sua sponte* by the district court for the purpose of ascertaining whether, and ensuring that, the petitioner's claims have been totally exhausted by a state tribunal when the State has waived exhaustion voluntarily.[6]

■ In the alternative, Lawson contends that the magistrate judge erred by failing to hold an *ex parte* evidentiary hearing at which his appointment motion could be adjudicated. Because the predicate statutes do not require the holding of a hearing, we reject this contention. 21 U.S.C. § 848(q)(9) and 18 U.S.C. § 3006A(e)(1) speak merely of "proceeding(s)" to be conducted *ex parte*. Following the holding of the *sua sponte* hearing, the magistrate judge offered Lawson the opportunity to answer the respondent's motion to dismiss his petition with written justifications for his request that a psychiatric expert be appointed. The magistrate judge's recommended findings of fact and conclusions of

---

6. Thus, we anticipate that, where the State has entered no waiver of exhaustion, district courts will continue to hold the *ex parte* proceedings required by the appointment statutes, and will, in the concealed venue of such proceedings, inform petitioners deemed to be raising new and unexhausted habeas claims that their petitions will be dismissed pursuant to *Rose v. Lundy* absent the bringing of additional state-court proceedings to exhaust the new claims.

law amply reflect the care with which the court considered Lawson's arguments on this point. The purpose of the statute's "proceeding" requirement is to ensure that the petitioner's motion is carefully examined by the court, not to force the holding of formal hearings for their own sake. Therefore, we conclude that the magistrate judge did not err by failing to hold a hearing on the merits of his appointment motion.

### B

We now consider Lawson's contention that the district court erred by applying the incorrect legal standard in adjudicating his appointment motion.

■ Both 18 U.S.C. § 3006A(e)(1) and 21 U.S.C. §§ 848(q)(9) require (1) that the habeas petitioner be financially unable to obtain the requested expert services on his own, and (2) that such services be "necessary" (18 U.S.C. § 3006A(e)(1)) or "reasonably necessary" (21 U.S.C. § 848(q)(9)) for the defendant's representation. Neither party contests Lawson's indigence. The only question, therefore, is whether expert services are "necessary" or "reasonably necessary" for Lawson's prosecution of the mental-competency claims in his habeas petition.

Lawson moved for the appointment of an expert psychiatrist after filing his habeas petition. Thus, he cannot assert that the psychiatrist's services were necessary to help prepare the claims in his pleading. Lawson proffered the affidavit of Dr. Billy Royal, the psychiatrist he asked the court to appoint, which stated that Dr. Royal already had formed his opinion on Lawson's alleged lack of competency and inability to waive his right to a sentencing hearing. Dr. Royal apparently requested further study on the issue of the presence of psychological mitigating evidence, although he opined tentatively in that area as well. Thus, it appears that Lawson already had marshalled the evidence he wished Dr. Royal to expound upon.

To determine whether Dr. Royal's appointment was "reasonably necessary," the district court had to decide whether the record, viewed in the light of Dr. Royal's forecasted evidence, required an evidentiary hearing in order to resolve the mental-competency claims in Lawson's habeas petition. Obviously, there was no need to appoint Dr. Royal if Lawson's petition raised no claims entitling him to a hearing at which the psychiatrist could present evidence of Lawson's competence. For the reasons stated in part IV, *infra,* we conclude that Lawson was not entitled to an evidentiary hearing on the claims presented in his habeas petition. We therefore hold that there was no "reasonable necessity" for Dr. Royal's appointment.

### C

Finally, Lawson argues that the district court's factual analysis of his motion was clearly erroneous and not fairly supported by the record. For the reasons set forth in the magistrate judge's recommended findings of fact and conclusions of law, *see Lawson v. Dixon,* No. C–88–738–S, slip op. at 35–61 (M.D.N.C. Aug. 19, 1991) (order and recommendation of United States Magistrate Judge), we disagree. After carefully comparing Lawson's motion and accompanying affidavit with the relevant portions of the state-court record, we are not left with "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Accordingly, we hold that the district court did not clearly err in analyzing Lawson's factual assertions with respect to his appointment motion.

### IV

In his second argument for reversal, Lawson contends that the magistrate judge erred in denying his motion for an evidentiary hearing on the four mental-health claims presented in his petition for the writ because the claims contained allegations not subjected to factual development in the state courts.

■ A habeas petitioner is not entitled to an evidentiary hearing on mental-competency claims in his habeas petition unless he presents clear and convincing evidence that creates a real, substantial, and legitimate doubt with respect to the petitioner's mental capacity and ability to assist his counsel at

trial. Such evidence must be both positive and unequivocal. *See, e.g., Adams v. Wainwright,* 764 F.2d 1356, 1360 (11th Cir.1985), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986). In order to meet this standard, we agree with the Fifth Circuit Court of Appeals that the petitioner must present "a history of mental illness, [or] substantial evidence of mental incompetence at or near the time of the trial supported by the opinions of qualified physicians and the testimony of laymen." *Flugence v. Butler,* 848 F.2d 77, 79 (5th Cir.1988). Should the petitioner clear this lofty hurdle, an evidentiary hearing will be convened at which he may prove his incompetence at the time of trial by a preponderance of the evidence.

For the reasons set forth in the magistrate judge's recommended findings of fact and conclusions of law, *see Lawson v. Dixon,* No. C–88–738–S, slip op. at 35–61 (M.D.N.C. Nov. 19, 1991) (order and recommendation of United States Magistrate Judge), we agree with the district court that Lawson has failed to present clear and convincing evidence of positive and unequivocal facts which generate a substantial and legitimate doubt as to his mental capacity. Accordingly, we affirm the district court's decision not to accord Lawson an evidentiary hearing on the psychological claims presented by his habeas petition.

## V

Lawson also assigns error to three matters arising from the guilt-innocence and penalty phases of his trial. First, he contends that there is a reasonable likelihood that the penalty-phase jury instructions unconstitutionally required the jurors unanimously to find and consider mitigating evidence. Second, he argues that the jury instruction on the offense of first-degree murder created a presumption of malice and thereby denied him due process of law. Third, he urges that prosecutorial misconduct so infected the trial as to deny him due process of law and to render the sentencing determination unreliable. The district court declined to issue the writ on any of these grounds. Because we have rejected precisely these contentions in previous decisions, we find them meritless in the instant case.

## A

■ In instructing the jury with respect to the weighing of aggravating circumstances against mitigating circumstances during the penalty phase of Lawson's trial, the superior court stated:

[The issue is] do you find unanimously beyond a reasonable doubt that the aggravating circumstance or circumstances found by you outweigg [sic] any mitigating circumstance or circumstances found by you.

Lawson attacks these jury instructions on the ground that they prevented the jury from considering mitigating evidence unless all twelve jurors agreed on the existence of a particular mitigating circumstance. He claims that the instructions in this respect violated the rules established in *Mills v. Maryland,* 486 U.S. 367, 384, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990).

In *Maynard v. Dixon,* 943 F.2d 407 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1211, 117 L.Ed.2d 450 (1992), this court examined a North Carolina jury instruction identical to that under review here. *Id.* at 419. We held that such an instruction "does not run afoul of *Mills/McKoy*" because it does not state that jurors must "agree unanimously" on the existence of a mitigating factor. *Id.* The question having been thus decided by a panel of this tribunal, we reject Lawson's argument without further discussion.

## B

■ During the jury charge at the guilt-innocence phase of Lawson's trial, the superior court instructed the jury that malice is

that condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict a wound with a deadly weapon upon another which approximately [sic] results in death.

The superior court then instructed the jury with respect to first-degree murder that

if the State proves beyond a reasonable doubt that the defendant intentionally killed ... Wayne Shinn with a deadly weapon that approximately [sic] caused his death, the law implies first, that the killing was unlawful, and second, that it was done with malice.

Lawson contends that this instruction was improper because it informed the jury that the law "implies," rather than allows, the drawing of an inference that malice existed. In *Rook v. Rice,* 783 F.2d 401 (4th Cir.), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986), and *Davis v. Allsbrooks,* 778 F.2d 168 (4th Cir.1985), this court considered North Carolina jury instructions identical to those under review here. In both cases we held that the instruction merely shifted the burden of production on the malice element of the crime to the defendant, but did not shift the ultimate burden of proof to him. *See Rook,* 783 F.2d at 405; *Davis,* 778 F.2d at 172–74. In light of our holdings in *Rook* and *Davis,* therefore, we reject Lawson's contention without further discussion.

### C

During summation at the guilt phase of Lawson's trial, the prosecutor argued to the jury that the victim's house was not his castle but his "crucifixion block." The prosecutor also argued that it was "sickening to me to think that defendants are tried in the beautiful courtroom like this." The prosecutor further stated that Lawson's constitutional rights should be compared with those of the victims, noting that Buren Shinn "had no attorney sitting next to him." He also urged that in other countries, after being convicted of first-degree murder, authorities would bring a rope and hang the defendant summarily. Lawson contends that these arguments so infected his trial as to render it fundamentally unfair, and that he therefore is entitled to the writ.

In *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Supreme Court reiterated that the standard in habeas cases for assessing improper prosecutorial comment is, as initially enunciated in *Donnelly v. De Christoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), whether the proceeding at issue was rendered fundamentally unfair by the improper argument. *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471; *Donnelly,* 416 U.S. at 647, 94 S.Ct. at 1873. This standard is the same for both the prosecution's guilt-innocence and penalty phase arguments. *E.g., Adams v. Aiken,* 965 F.2d 1306, 1320 (4th Cir.1992), *cert. denied sub nom. Adams v. Evatt,* —— U.S. ——, 113 S.Ct. 2966, 125 L.Ed.2d 666 (1993); *Gaskins v. McKellar,* 916 F.2d 941, 951 (4th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 14, 115 L.Ed.2d 1098 (1991). In determining whether a prosecutor's comments denied the defendant fundamental fairness, the Supreme Court has emphasized the necessity of looking to the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated. *Darden,* 477 U.S. at 182, 106 S.Ct. at 2472; *Donnelly,* 416 U.S. at 647, 94 S.Ct. at 1873.

Here the evidence of Lawson's guilt was overwhelming. The prosecutor's comments, while excessive and needlessly inflammatory, were relatively isolated. Viewing the comments in light of the superior court's accurate instructions to the jury on the elements of the crimes charged and the heavy quantum of proof necessary to convict the defendant of their commission, we hold that the State's closing arguments did not deprive Lawson of due process.

### VI

For the foregoing reasons, the judgment of the district court is hereby

*AFFIRMED.*