**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CARL HAMILTON CHICHESTER,
Petitioner-Appellant,

v.

No. 98-15

JOHN TAYLOR, Warden, Sussex I
State Prison,
Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CA-97-155-3)

Argued: October 28, 1998

Decided: January 6, 1999

Before WILKINSON, Chief Judge, and LUTTIG and
MOTZ, Circuit Judges.

_____

Dismissed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Edward Lee, Jr., VIRGINIA CAPITAL REPRE-
SENTATION RESOURCE CENTER, Richmond, Virginia, for
Appellant. Katherine P. Baldwin, Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for
Appellee. **ON BRIEFS:** Mark E. Olive, VIRGINIA CAPITAL REP-
RESENTATION RESOURCE CENTER, Richmond, Virginia; Jeane

A. Thomas, Alyson L. Redman, CROWELL & MORING, Washington, D.C., for Appellant. Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

———————————————————————————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

———————————————————————————————

## OPINION

PER CURIAM:

Carl Hamilton Chichester appeals the district court's dismissal of his petition for writ of habeas corpus, challenging his conviction in Virginia state court for capital murder. We deny Chichester's motion for a certificate of appealability and dismiss the appeal.[1]

I.

At approximately 10:30 p.m. on August 16, 1991, two black men entered a Little Caesars pizza restaurant in Manassas, Virginia, wearing dark clothing, masks, and gloves, and carrying semi-automatic pistols. One man was about three inches taller than the other. The shorter man jumped over the counter, took money from one of the two cash registers, and demanded that Timothy Rigney, the manager of the restaurant, open the second register. The taller man remained on the customer side of the counter. Rigney attempted to open the register, but was unable to do so. When Rigney indicated that he

———————————————————————————————

[1] Because appellant filed his petition for writ of habeas corpus on June 19, 1997, after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) on April 24, 1996, our review of the petition is governed by the deferential standards of 28 U.S.C. § 2254(d), as amended by the AEDPA. See Green v. French, 143 F.3d 865, 868 (4th Cir. 1998). However, like the district court, we conclude that appellant would not be entitled to relief even under the more stringent pre-AEDPA standards of review.

2

could not open the register, one of the two men shot and killed him. The two men then fled the scene on foot.

Because both men were masked, none of the four eyewitnesses to the murder could identify either of them. However, Jack Burdette, a man who was in the vicinity at the time of the murder, told police that night that he had seen two men wearing dark clothing running from the direction of the restaurant. On February 18, 1993, Burdette told police that he had recognized one of the two men as appellant Carl Hamilton Chichester ("Chichester"). He later testified that he had not named Chichester on the night of the murder because he was concerned about the safety of his family.

Of the three eyewitnesses who testified at trial, two testified that they thought that the man on the customer side of the counter -- believed to be Chichester -- was the shooter, and one testified that she was unsure which man was the shooter. Denise Matney, an employee, originally told police that she was unsure which man was the shooter, but testified at trial that it was the man on the customer side of the counter. Robert Harris, a customer, also testified that the man on the customer side of the counter was the shooter. Patricia Eckert, Harris' girlfriend, originally told police that she thought that the man on the employee side of the counter was the shooter, but testified at trial that she was unsure of the identity of the shooter because she had buried her face in Harris's chest in fright. A fourth eyewitness, William Fruit, a 16-year-old employee, was unavailable to testify at trial, but originally told police that he thought that the man on the employee side of the counter was the shooter.

At trial, the prosecution introduced evidence relating to an earlier robbery of Joe's Pizza for which Chichester and his alleged accomplice had been convicted. On August 7, 1991, nine days before the Little Caesars robbery, two black men entered Joe's Pizza in Manassas, wearing dark clothing, masks, and gloves, and carrying semi-automatic pistols. One man was noticeably taller than the other. The shorter man proceeded immediately to the cash register; the taller man held his gun to the head of one of the employees and fired, but somehow missed. The two men then fled the scene on foot. In addition to evidence relating to the Joe's Pizza robbery, the prosecution introduced a substantial amount of circumstantial and forensic evidence

3

implicating Chichester and his alleged accomplice in the Little Caesars robbery, including evidence that a shoeprint left on the counter at Little Caesars matched that of a shoe found in the home of Chichester's alleged accomplice, and evidence that Chichester told a friend that he needed to dispose of a pistol because"he had a body on the gun."

In response to the prosecution's evidence, the defense introduced evidence suggesting that Chichester was in Washington at his job in the family janitorial business on the evening of the murder. Chichester's mother, Vivian Chichester, testified that she had Chichester pencilled in on her schedule to work that evening, and Chichester's sister, Vivian Pina, who was also scheduled to work that evening, testified that she frequently worked with Chichester on weekends. Neither Chichester's mother nor his sister, however, had any independent recollection that Chichester actually worked on the evening of the murder.

Chichester was found guilty of capital murder, robbery, and firearms charges on September 20, 1993. On December 2, the trial judge imposed a sentence of death, based on the jury's findings of the aggravating factor of future dangerousness and no mitigating circumstances. The Virginia Supreme Court affirmed the sentence on September 16, 1994, see Chichester v. Commonwealth, 248 Va. 311 (1994), and, on February 21, 1995, the United States Supreme Court denied Chichester's petition for writ of certiorari, see Chichester v. Virginia, 513 U.S. 1166 (1995). On August 30, 1995, Chichester filed a petition for writ of habeas corpus in the Virginia Supreme Court. On November 19, 1996, the petition was dismissed, and, on January 10, 1997, Chichester's petition for rehearing was denied. On June 19, 1997, Chichester filed this petition for writ of habeas corpus in the United States District Court for the Eastern District of Virginia. The district court dismissed the petition on April 7, 1998. From that order of dismissal, Chichester appealed.

II.

Appellant initially raises two types of claims of ineffective assistance of counsel. First, appellant asserts that trial counsel was ineffective for failing to investigate and present evidence allegedly

suggesting that the man on the customer side of the counter -- purportedly Chichester -- was not the "triggerman" in the shooting. Second, appellant asserts that trial counsel was ineffective for failing to impeach the testimony of Jack Burdette, the only witness to place Chichester at the scene of the crime. Appellant also contends that the district court incorrectly denied his motion for the appointment of experts to assist in the development of his claim of prejudice resulting from trial counsel's actions. We address each of these claims in turn, evaluating appellant's ineffective assistance claims under the two-prong standard of Strickland v. Washington, 466 U.S. 668 (1984).

A.

Appellant first asserts that trial counsel was ineffective for failing to investigate and present various pieces of evidence allegedly suggesting that Chichester was not the "triggerman" in the shooting, and therefore not guilty of capital murder under Virginia law. See Johnson v. Commonwealth, 220 Va. 146, 149-50 (1979).

We begin by considering whether it was unreasonable for counsel to fail to introduce evidence at trial that Chichester was not the shooter. At trial, counsel relied heavily on the defense that Chichester was not involved in the Little Caesars robbery at all, presenting evidence from Chichester's mother and sister suggesting that Chichester was at his job in Washington as a janitor in the family business on the evening of the murder. See supra at 4. In order to present evidence that Chichester's accomplice, and not Chichester, was the shooter, counsel would have had to acknowledge the possibility that Chichester was present at the crime scene -- an admission that would have seriously undermined Chichester's alibi defense and potentially subjected Chichester to conviction on all of the non-murder charges. We therefore agree with the district court that trial counsel's failure to present such inconsistent evidence was not unreasonable. See Mazzell v. Evatt, 88 F.3d 263, 268 (4th Cir.) (holding that trial counsel's failure to seek jury instruction that defendant was accessory to crime, rather than principal, was not unreasonable because it would have been inconsistent with trial counsel's strategy to pursue an alibi defense), cert. denied sub nom. Mazzell v. Moore, 519 U.S. 1016 (1996).

5

We next consider whether, even if trial counsel was not under an obligation to present evidence at trial that his client was not the triggerman, counsel nevertheless should have investigated such evidence, either in order to test the validity of the alibi defense or in order to impeach evidence presented by the Commonwealth at trial. In Strickland, the Supreme Court specifically addressed the question of the scope of trial counsel's duty to investigate:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Strickland, 466 U.S. at 691; see also Barnes v. Thompson, 58 F.3d 971, 979-80 (4th Cir. 1995) ("[T]rial counsel. . . may rely on the truthfulness of his client and those whom he interviews in deciding how to pursue his investigation.").

As the Supreme Court suggests, therefore, we begin our inquiry by examining what Chichester told trial counsel about his whereabouts on the evening of the murder. Chichester did not testify at any stage of the trial or sentencing proceedings. Trial counsel, however, submitted an affidavit, stating as follows:

> Chichester and his mother told us that his mother and sister, Vivian, were the only witnesses who knew his whereabouts

6

> on the night of the crime and that there were no independent witnesses who could testify <u>as to alibi</u>. We relied on this information in our investigation of the case and presented his mother and sister as witnesses at trial.

J.A. at 3262 (affidavit of R. Randolph Willoughby and Bryant A. Webb) (emphasis added). We read this statement unambiguously to mean that Chichester and his mother told trial counsel that Chichester was elsewhere on the night of the murder and that this could be confirmed by his mother and sister. To hold that it was objectively unreasonable for trial counsel not to fully investigate other possible defenses under which it would be conceded that Chichester was at the scene of the crime -- and indeed a participant in the crime itself -- would contravene the Supreme Court's clear announcement in <u>Strickland</u> that trial counsel may rely on information provided by their client in determining what lines of inquiry to pursue. Consequently, we conclude that any decision by trial counsel not to investigate, much less present, evidence that appellant was not the triggerman was also reasonable.

Even assuming that counsel had an obligation to pursue the accomplice defense notwithstanding appellant's reliance upon an alibi defense, it was reasonable for counsel not to pursue, or not to pursue further, the particular lines of inquiry urged by appellant. First, appellant asserts that trial counsel should have located, and presented the testimony of, William Fruit, the 16-year-old employee who originally told police that the man on the employee side of the counter was the shooter. However, we conclude that trial counsel did make reasonable efforts to locate Fruit, even if they were not under an obligation to do so. Trial counsel attempted to find Fruit at the address that had been given to police at the time of the shooting, but found that he had apparently moved. J.A. at 3264. Although Fruit's new address appears to have been publicly available, <u>id</u>. at 3507, trial counsel was aware of the fact that the Commonwealth had subpoenaed Fruit to testify at the earlier trial of Chichester's alleged accomplice, but the subpoena had been returned because Fruit could not be found, <u>id</u>. at 3264. Further, even if trial counsel had located Fruit, it seems unlikely that Fruit would have been willing to testify: Fruit's family appears to have been reluctant to allow even the Commonwealth's attorneys to talk to Fruit because of the understandable emotional trauma he

7

suffered from the shooting, id. at 3288, and Fruit, who has since been located, continues to refuse to talk to appellant's attorneys, id. at 3508. Consequently, in view of the difficulty in locating Fruit and the unlikelihood that Fruit would have been willing to cooperate even if located, trial counsel's decision not to undertake any additional efforts to locate Fruit was certainly reasonable.

Second, appellant asserts that trial counsel should have questioned Patricia Eckert, one of the eyewitnesses to the murder, about the inconsistency between her earlier statement to police that the man on the employee side of the counter was the shooter and her subsequent statement at trial that she did not see which man was the shooter. See supra at 3. Again, however, trial counsel's decision not to cross-examine Eckert in this fashion was not unreasonable. As counsel explained, Eckert, in her testimony, had cast doubt on the testimony of other witnesses that the shorter of the two men had jumped over the counter, stating instead that the two men were of the same height. J.A. at 3263-64. Because Eckert's direct testimony was actually helpful to the defense in this regard, trial counsel's purposeful decision not to try to impeach Eckert's testimony on cross-examination was reasonable as a matter of trial strategy.

Third, appellant contends that trial counsel failed to exploit testimony by Denise Matney, another of the eyewitnesses, that the man on the customer side of the counter was carrying a "box-like" gun. Appellant argues that this description would fit the 9-millimeter handgun used in the Joe's Pizza robbery, but not the .380-caliber handgun used in the Little Caesars robbery. As the Commonwealth's ballistics expert, Julian Mason, testified, however, a 9-millimeter handgun and a .380-caliber handgun are "very similar in appearance." J.A. at 1587. In view of the absence of any contrary evidence to suggest that Matney's description of the gun as "box-like" could not possibly fit a .380-caliber handgun, trial counsel's decision not to exploit Matney's testimony was reasonable.[2]

_____

[2] Appellant also argues that trial counsel was deficient for failing to retain an expert to clarify that a 9-millimeter handgun, such as the one used in the Joe's Pizza robbery, could not be used to fire a .380-caliber bullet, such as was used in the Little Caesars murder. Mason, however, himself testified, and the Commonwealth later stipulated, that a 9-millimeter handgun could not be so used. J.A. at 1587, 1592.

8

Fourth, and finally, appellant asserts that trial counsel should have sought and introduced expert evidence to challenge the testimony of Mason, the Commonwealth's ballistics expert, and Dr. Frances Field, the Commonwealth's medical examiner. Mason testified that the bullet used in the murder must have been fired from a distance of more than two to three feet away because there was no gunpowder residue on the victim's shirt. Id. at 1588. Field testified that the bullet entered the victim's body in the upper left chest and traveled downwards and to the right. Id. at 1085. Appellant, however, has made no showing that contrary expert opinion exists. In the absence of any such showing, appellant's argument that trial counsel's failure to seek and introduce contrary opinion was unreasonable also lacks merit.[3]

B.

Appellant next asserts that trial counsel was ineffective for failing to impeach the testimony of Jack Burdette, the only witness to place Chichester at the scene of the crime. Appellant advances several grounds on which Burdette's testimony could have been impeached, most notably Burdette's convictions for various crimes, his alcoholism, and his incomplete initial statements to the police about the Little Caesars incident. All of these grounds for impeachment, however, were brought out by the Commonwealth on direct testimony. J.A. at 1179-80 (convictions for various crimes), 1183-84 (alcoholism), 1193-95 (incomplete initial statements).[4] We conclude that trial counsel's failure to harp on this evidence during cross-examination was

_____

[3] Appellant further argues that trial counsel should have challenged Field on cross-examination regarding the fact that she did not indicate in her coroner's report whether she had recovered a bullet from the victim's body or whether she had discovered any traces of gunpowder residue. This claim is frivolous. Field testified that she had recovered a bullet and given it to the police, J.A. at 1085-86, and explicitly stated in her report that she found no gunpowder residue around the entrance wound, id. at 3276.

[4] Appellant also offers, as a ground for impeachment, the fact that Burdette's description of the clothing allegedly worn by the two men differed from that given by other eyewitnesses. However, trial counsel extensively questioned Burdette on cross-examination about the details of his description of the clothing. J.A. at 1207-09.

9

not unreasonable. See Hunt v. Nuth, 57 F.3d 1327, 1333 (4th Cir. 1995) (refusing to indulge in a "grading of the quality of counsel's cross-examination").

C.

Finally, in connection with his ineffective assistance claims, appellant contends that the district court incorrectly denied his request for the appointment of experts to assist in the development of his claim of prejudice resulting from trial counsel's actions. In order to obtain expert assistance, appellant must show that the appointment of experts is "reasonably necessary" for his representation. 21 U.S.C. § 848(q)(9). In making such a showing, appellant must demonstrate that the appointment of experts is necessary because his habeas petition raises claims entitling him to a hearing at which such experts could testify. See Lawson v. Dixon, 3 F.3d 743, 753 (4th Cir. 1993). Appellant's petition, however, raises no such claims. Specifically, because appellant failed to establish that any of trial counsel's actions were unreasonable, it is simply unnecessary to determine whether trial counsel's actions were also prejudicial, much less to hold a hearing on the matter. See Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim. . . even to address both components of the inquiry if the defendant makes an insufficient showing on one."). Consequently, we conclude that the district court correctly dismissed appellant's petition without granting his request for expert assistance.

III.

Appellant next asserts that the district court should have considered his procedurally defaulted claims because William Fruit's pretrial statement that the man on the employee side of the counter was the shooter constituted "new evidence" sufficient to sustain a "gateway" actual innocence claim under Schlup v. Delo, 513 U.S. 298 (1995).[5]

_____

[5] In his brief, appellant seems to suggest that expert evidence supporting the argument that appellant was not the triggerman should also be considered as "new evidence" for purposes of his actual innocence claim. As noted above, however, appellant nowhere demonstrates that such expert evidence even exists. See supra at 9.

10

Specifically, appellant challenges the district court's holding that Fruit's pretrial statement did not constitute "new evidence" because it was known to counsel before trial.

Even assuming arguendo that the district court somehow erred in concluding that Fruit's pretrial statement was not"new evidence," we hold that the statement was insufficient to sustain an actual innocence claim under Schlup. A substantial claim of actual innocence is "extremely rare." Id. at 321, 324. In order to prevail on a "gateway" claim of actual innocence, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 327; see also O'Dell v. Netherland, 95 F.3d 1214, 1249-50 (4th Cir. 1996) (discussing application of Schlup standard), aff'd, 521 U.S. 151 (1997). We hold that appellant failed to meet this high standard. At trial, the prosecution introduced the testimony of two other eyewitnesses that the man on the customer side of the counter was the shooter, forensic evidence further indicating that the man on the customer side was the shooter, and evidence indicating that testimony that Chichester said he needed to dispose of a pistol because "he had a body on the gun." Weighing the considerable body of evidence indicating that the man on the customer side of the counter was the shooter against the single pretrial statement of an underage witness that the man on the employee side of the counter was the shooter, we conclude that it was not more likely than not that no reasonable juror would have convicted appellant on the basis of the evidence when taken as a whole. Because the Schlup standard was therefore not met, we reject appellant's actual innocence claim.

IV.

Finally, appellant asserts that the district court improperly admitted evidence of the Joe's Pizza robbery, in violation of his constitutional rights. Specifically, appellant asserts that the evidence was admitted in violation of the Commonwealth's rule of evidence barring the admission of evidence of prior crimes to show propensity to commit the crime charged. See, e.g., Spencer v. Commonwealth, 240 Va. 78, 89 (1990).

As a threshold matter, we refuse to consider whether the trial court erroneously applied Virginia's rule regarding "bad acts" evidence,

11

because federal habeas relief simply does not lie for errors of state law. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Our review, therefore, is limited to a consideration of whether any prejudice from the admission of the evidence of the Joe's Pizza robbery so outweighed its probative value as to give rise to "circumstances impugning fundamental fairness or infringing specific constitutional protections." Grundler v. North Carolina, 283 F.2d 798, 802 (4th Cir. 1960).[6]

We conclude that the Grundler standard was not met in this case. As the Virginia Supreme Court noted, the Joe's Pizza robbery bore significant similarities to the Little Caesars robbery:

> Both robberies occurred within nine days and in close geographic proximity to each other; both robbers were black, one was taller than the other, both were armed; both robberies appeared to have been carefully planned to minimize the victims' opportunity to identify the robbers; both robbers wore masks and gloves; on each occasion, the taller man retrieved the spent cartridge after firing his gun; and in both robberies, the robbers fled from the scene on foot, rather than in a vehicle, to minimize the possibility of its identification.

> Further, each robber appeared to be familiar with the premises and the role he was to play in the crimes. In both instances, the shorter man immediately went behind the counter to get the money from the cash register and appeared to know how to gain immediate access to the areas behind the counter.

---

**6 Cf**. Thompson v. Oklahoma, 487 U.S. 815, 878 (1988) (Scalia, J., dissenting) ("We have never before held that the excessively inflammatory character of concededly relevant evidence can form the basis for a constitutional attack, and I would decline to do so in this case. If there is a point at which inflammatoriness so plainly exceeds evidentiary worth as to violate the federal Constitution, it has not been reached here.").

12

Chichester, 248 Va. at 327. Having considered the substantial similar-
ities -- and few differences -- between the two robberies, we believe
that the pattern of the Joe's Pizza robbery resembled that of the Little
Caesars robbery so closely as to render evidence of the earlier robbery
highly probative. Because the significant probative value of the evi-
dence was not outweighed, much less sufficiently outweighed, by any
prejudice from its admission, the "fundamental fairness" of appel-
lant's trial was not compromised. We therefore reject appellant's
claim.

CONCLUSION

Following the dismissal of his federal habeas corpus petition,
Chichester filed a motion in this court for a certificate of appeala-
bility. See 28 U.S.C. § 2253(c)(2). Because we conclude that Chiches-
ter has failed to make the requisite "substantial showing of the denial
of a constitutional right," id., we deny Chichester's motion and dis-
miss his appeal.

DISMISSED

13